UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) | Civil Action No.: 4:14-cv-3615-BHH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| MCLEOD HEALTH, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This action arises out of Cecilia Whitten's termination with Defendant. The Equal Employment Opportunity Commission (EEOC) alleges that Defendant subjected Whitten to improper medical examinations and terminated her employment in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq. Presently before the court is Defendant's Motion for Summary Judgment (Document # 40). Plaintiff timely filed a Response (Document # 44) to the Motion, to which Defendant filed a Reply (Document # 50). A hearing was held on October 22, 2015. All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC. This report and recommendation is entered for review by the district judge.

## II.    FACTS

### A.    Whitten's Physical Limitations and Health

Whitten was born with severe congenital defects affecting her right arm, as well as both legs, ankles, and feet, which include missing fibulas, missing digits, shortened and missing tendons, and malformed tibias. EEOC Intake Questionnaire (Document #40-2 at 109); Whitten Dep. 10-12. Her deformities are noticeable. Whitten Dep. 30-31. Whitten's conditions have resulted in several severe

and lifelong effects. Whitten Dep. 17-19. Regarding her right hand, Whitten does not have much dexterity, has trouble grasping things, has "trouble picking up things that are heavy," and has "to be careful about holding things and picking up things with it because it's not as useful as [her] left hand." Whitten Dep. 17. Whitten also has always experienced stability issues, cannot stand for long periods, and cannot walk long distances. Whitten Dep. 18-19, 20-21, 42-43. Due to her unique physiology, Whitten's toes tend to catch on objects such as rugs, which can cause her to fall. Whitten Dep. 19-20, 21-22, 62; EEOC Intake Questionnaire (Document # 40-2 at 109). As Whitten testified, "Falling has been part of my life all my life and there's no way around it." Whitten Dep. 83. Whitten's falls, however, were not caused by cardiac or other medical issues, just her unique physiology. Whitten Dep. 19-20, 21-22, 41, 62; EEOC Intake Questionnaire (Document #40-2 at 109).

Whitten's medical records show that during the relevant time period, her health, while not optimal, had been consistent for at least two decades. From July 1992 through the end of 2012, Whitten weighed around 250 pounds, frequently had a pulse rate near or in excess of 100 beats per minute, and had elevated blood pressure. Whitten Medical Records (Ex. A to Pl. Resp.).

### B.    Communications Specialist Position

Whitten worked for 28 years as the editor of [Defendant's] employee newsletter, McLeod News. EEOC Intake Questionnaire (Document #40-2 at 109). Whitten was responsible for harvesting stories for McLeod News by interviewing relevant persons, taking relevant photographs, writing the stories, creating the layout, and editing the newsletter. Whitten Dep. 72-73; 75-77 and DFT. EXH. 1. She was expected to find her own stories, as well as interview the relevant people in person. Whitten Dep. 75-77; Swindler Dep. 18-19, 21.

Defendant represents that the job required the physical ability to travel to a location and

navigate within the location, including getting to the source of the story and getting to the interviewees and photo locations at all of MHI's campuses. Whitten Dep. 56; 99-100. It also required her to go into the community to cover MHI's participation in events off campus. Whitten Dep. 99-102; Swindler Dep. 29-30.  Whitten stated in her EEOC Intake Questionnaire that the job required her to "[o]ccassionally [] go out of the office to interview subjects of articles, take photographs, and attend hospital events." EEOC Intake Questionnaire (Document #40-2 at 109). However, in her deposition, Whitten agreed that in-person interviewing and taking her own photographs is the best form of journalism and the preferred way of performing her required work, and that in-person journalism required Whitten to go where the stories occurred. Whitten Dep. 56, 69, 70, 73, 75-77, 99-102, 154-155.

Defendant previously admitted Whitten's "medical condition [did] not impact[] her ability to perform the essential functions of her job during her employment." Document stamped EEOC-McLeod000115 (Ex. B to Pl. Resp.).  In addition, Swindler had never expressed concerns over Whitten's ability to perform her essential functions.  Whitten Dep. 34.  The written job description for the Communications Specialist position Whitten held lists no physical requirements. Communication Specialist Job Description (Document #40-2 at 115-18).   However, the "heaviest amount of lifting" for the position is "20 lbs or less," placing the position in the sedentary to light work classification, per Department of Labor standards. Document stamped EEOC-McLeod000982 (Ex. B to Pl. Resp.); Document Stamped MCLEOD-O-000049 (Ex. C to Pl. Resp.); Laliberte Dep. 35-36, 37.  Defendant states that being able to perform the functions safely is an essential function of all jobs. Therefore, essential functions of her job required her to safely traverse all of Defendant's facilities and the surrounding community to document stories with photography and interviews, and physically endure the work at those locations. Whitten Dep. 56, 99-102; Swindler Dep.  29-30.

-3-

Whitten agrees she could not perform her job without falling. Whitten Dep. 85-86.

### C.     Swindler's Observations of Whitten's Performance

Swindler rated Whitten "successful" in her 2011 performance evaluation, and did not indicate any performance issues.  Documents stamped MCLEOD-E-000033-000040 (Ex. C to Pl. Resp.); Swindler Dep. 50. Since 1995, Whitten has had documented issues with tardiness and meeting deadlines, but she has never been disciplined regarding either.  Whitten Performance History (Ex. D to Pl. Resp.); Swindler Dep. 34.

In late 2011 and early 2012, Swindler began to notice a decline in Whitten's enthusiasm and degeneration in her performance.  Swindler Dep. 30-31, 34-35. Swindler felt that Whitten had become extremely negative about the organization's message and lost her drive, creativity, initiative, and enthusiasm.  Swindler Dep. 30-31; 35-36. Whitten was failing to produce and meet deadlines even though Swindler had already reduced her workload and asked other employees to help support McLeod News, which was supposed to be only Whitten's responsibility. Swindler Dep. 23, 35. Swindler addressed her performance concerns, both with Human Resources and directly to Whitten, on multiple occasions.  Whitten Dep. 152-53 and DFT. EXH. 12; Swindler Dep. 47-48, 60-61.

Swindler also noticed Whitten was declining physically. Swindler Dep. 31-33. Whitten was frequently absent; and, when she was at work, she was winded, flushed, unkempt, and/or clammy. Swindler Dep. 31-33.  Her walk was visibly labored and unstable, and she was often found sweaty, wet, and winded after walking mere feet. Swindler Dep. 32, 40. Swindler testified that others observed Whitten getting drowsy and nodding off during staff meetings and that she received multiple complaints from Whitten's co-workers that she was sleeping on the job.  Swindler Dep. 32.

Swindler also began receiving complaints that Whitten was avoiding performing certain aspects of her work; instead of going to do the interviews and stories herself, she would ask others

to write something and send it to her with some photographs. Swindler Dep. 31, 35, 39-40; Whitten

Dep. 154. Coworkers specifically complained that Whitten was enlisting them to do her job on top

of their own responsibilities.  Swindler Dep. 35, 39-40.

> **D.    Whitten's Falls**

In April of 2012, Whitten fell after tripping on a Cypress tree root while on a weekend outing

with her sister and had to be taken to the Emergency Room via an ambulance. Whitten appeared for

work with stitches in her face.  Whitten Dep. 37, Document stamped McLeod–C–000053 (Ex. H to

Def. Motion).  In May of 2013, Plaintiff fell when she caught her toe on a mat while entering one

of Defendant's facilities.  Whitten Dep. 61; EEOC Intake Questionnaire (Document #40-2 at 109);

Document stamped McLeod–D–000100-101 (Ex. H to Def. Motion). On July 11, 2012, Whitten was

leaving a local restaurant during her lunch break when she caught her foot on a rug and fell.  EEOC

Intake Questionnaire (Document #40-2 at 109). Defendant was advised that Whitten had fallen and

was going to McLeod Urgent Care to have her arm checked out.  EEOC Intake Questionnaire

(Document #40-2 at 109-10).[1]

> **E.    Defendant's Medical Examinations of Whitten**

On July 12, 2012, the day after Whitten's fall, she returned to work as usual.  EEOC Intake

Questionnaire (Document  #40-2 at 110).  That same day Swindler contacted Shannon Carr in

Human Resources to seek guidance on how to proceed. Swindler and Carr had had several previous

discussions in late 2011 and early 2012 regarding Whitten's drop in performance and Whitten's

seemingly deteriorating health. Carr recommended they speak to Occupational Health to see if they

---

[1]Swindler recalls two other instances in late 2011 where Whitten fell while attempting to sit
in a chair while at Swindler's house, and when Whitten stumbled while entering a staff meeting.
Swindler Dep. 83, 57.

agreed a fitness for duty was merited. Swindler Dep. 60-62; Carr Dep. 19, 20-22, 23-25.

Swindler and Carr contacted Octavia Williams-Blake, the Associate Vice President of Occupational Health. Carr Dep. 20; Williams-Blake Dep. 22. Swindler explained what she had been witnessing: the drop in job performance; avoidance of doing the in-person interviews and photographs; the frequency of Whitten's falls; Whitten's observed instability; and Whitten's own communicated concerns about her ability to navigate. Swindler Dep. 52; Williams-Blake Dep. 22. Because Williams-Blake managed Defendant's Workers' Comp and Occupational Health, she was already familiar with Whitten. Williams-Blake Dep. 23-24, 25-26. Williams-Blake discussed the information reported from Swindler, together with her own knowledge of Whitten's impairment and history of falls at work, with Michelle Pittard and Dr. Hyman in Occupational Health and they agreed a fitness for duty was merited.  Williams-Blake Dep. 22; Carr Dep. 19-20; Swindler Dep. 59.

Swindler came to Whitten's office and told Whitten she needed to go to Employee/Occupational Health for a fitness for duty examination. EEOC Intake Questionnaire (Document # 40-2 at 110).  Swindler told Whitten that "since [Whitten] had had several falls, [Defendant] wanted to examine [her] work space and make sure it was safe." EEOC Intake Questionnaire (Document # 40-2 at 110); Whitten Dep. 35.  Whitten "was confused about the necessity for this concern (especially since only one of the falls had been at work), but [] didn't feel that [she] had a choice but to comply." EEOC Intake Questionnaire (Document #40-2 at 110); Whitten Dep. 50-51.

Michelle Pittard, a nurse practitioner, conducted the July 12, 2012 fitness for duty examination. Prior to the examination, Whitten filled out a comprehensive medical history form. Document stamped MCLEOD-D-000143 (Ex. C to Pl. Resp.). Pittard was given a job description for Whitten's position, and she understood Whitten's job duties to include the physical ability to

safely go out in the environment to conduct interviews and take photos. Pittard Dep. 18, 34, Whitten Dep. 56, 99-102 and DFT. EXH 2. Whitten and Pittard discussed Whitten's congenital condition, decreased mobility, and recent falls; specifically, Whitten explained to Pittard that her recent falls had been caused by her foot catching items on the ground, like rugs. Pittard Dep. 14, 19-20. Pittard then undertook an examination of Whitten's cardiovascular and respiratory health; physically manipulated her joints and neck; assessed Whitten for neurological and psychiatric issues; and conducted a hearing whisper test. ECF #40-6 at 25; Pittard Dep. 15-16, 21-31. Each aspect of her exam concerned an issue that could cause falls, contribute to falls, or could indicate the severity of the falls. Pittard Dep. 21-23, 27-28, 29, 30-31. During the exam, Whitten herself vocalized concerns about stability, falling, and her ability to ambulate. Pittard Dep. 19-21. Whitten specifically raised concerns about her ability to navigate curbs without falling, admitted her decreased mobility contributes to her falls, and informed Pittard that her ankles and knees caused her great difficulty and instability. Pittard Dep. 21, 33-34 and Pittard EXH. 3; Whitten Dep. 53-54 and DFT. EXH. 2.

Following her examination of Whitten, Pittard recommended a functional capacity examination or work capacity examination.[2] Documents stamped MCLEOD-D-000115 (Ex. C to Pl. Resp.); Pittard Dep. 24. She ordered the exam because Whitten admittedly had limited stability due to her congenital birth defects, self-reported a recent increase in falls, did not use her previously recommended assistive device, and had personally expressed to Pittard her own concerns about falling at work, particularly in the parking lot. Pittard Dep. 24, 35-37, 48. Although Pittard did not consult with a doctor in making her recommendation, Pittard Dep. 41; Hyman Dep. 10, Pittard's Supervisor, Dr. Peter Hyman, the Medical Director of the Occupational Health Clinic, reviewed

---

[2]Defendant appears to use these two phrases interchangeably, while Plaintiff uses "functional capacity examination."

Pittard's report. Hyman Dep. 10-11. Given the reoccurring falls, physical abnormalities, and Whitten's own documented concerns about falling, Dr. Hyman agreed the decision to place her on administrate leave and refer her to further testing was warranted. Hyman Dep. 12. Pittard did not explain to Whitten what "functional capacity exam" meant, and Whitten "felt very confused about the need for the test and about whether my environment (as I had originally been told) or I myself was being examined." EEOC Intake Questionnaire (Document #40-2 at 10); Whitten Dep. 57. Following the fitness for duty examination by Pittard, Whitten was involuntarily placed on paid administrative leave from July 12, 2012, until Occupational Health could complete their review of Whitten's ability to safely perform the essential functions of her job.   Whitten Dep. 58, 60; Williams-Blake Dep. 32-33; Carr Dep. 27-29 and Carr Exh. 1.[3]

On July 26, 2012, Todd Laliberte, Functional Capacity Evaluator Specialist, conducted a functional capacity examination of Whitten.  Before doing the exam, Laliberte spoke with Swindler to try and understand Whitten's job. Swindler Dep. 63-65; Laliberte Dep. 22, 47. Laliberte then objectively observed Whitten's office area.  Laliberte Dep.  20-21. Laliberte determined what data was relevant for his assessment based on what was pertinent to performing the essential physical demands of the job. Laliberte Dep. 23. Laliberte did not ask Whitten about her fall history because he "wasn't worried about the route [sic] [cause]."  Laliberte Dep. 33, 81.

Laliberte structured an exam that would mirror the duties required of Whitten's position. Laliberte Dep. 45-46, 47-48. The tests and tasks Laliberte had Whitten perform were based upon: (1) his judgment of the duties and capabilities required of a Communication Specialist after thoroughly reviewing the results of his Work Site Assessment and the essential functions of

---

[3]On or around July 16, 2012, while on paid administrative leave, Whitten advised that she had fallen again at home and sprained her right ankle.  Whitten Dep. 60-61.

Whitten's job, which included mobility with camera equipment and other journalism materials, as indicated on the job description; and (2) after soliciting Whitten's own subjective input. Laliberte Dep. 45-46, 47-48.

Laliberte's examination lasted three hours and 40 minutes and required Whitten to stand on one foot for up to two minutes, squat, kneel, stoop, push, pull, and grip, among other tasks. ECF #40-8 at p. 64-68; Laliberte Dep. 63-83. Although Laliberte had been told by Defendant the "heaviest amount of lifting" for Whitten's position was "20 lbs or less," Laliberte required Whitten to carry a 38-pound weight during the examination. Laliberte Dep. 37, 71. Whitten does not recall discussing anything with Laliberte before beginning the exam other than the writing aspect of the job, Whitten Dep. 69, but Laliberte testified that Whitten showed him what she had to carry and Laliberte weighed the objects and concluded that Whitten would need to carry up to 50 lbs. to perform the job. Laliberte Dep. 47-48, 58, 69-70, 78. Based upon the job description provided, Laliberte originally classified Whitten's job as sedentary to light work. Laliberte Dep. 35. However, after Whitten's input, he changed her classification to medium (50 lbs. of force), and restructured his test to more accurately reflect what Whitten reported she actually did. Laliberte Dep. 36-37, 58.

According to Whitten,

> I was determined to do as well as I could with the functional capacity exam. Todd put me through the two-hour [sic] test, watching me walk with my cane, balance on one foot (I've never been able to do that), go up and down a curb, sit at a desk and write a story, and to carry one and then two heavy valises. I carried the two valises 170 feet, without the use of my cane. (He said that the administrative staff job description—which I had never seen before—required being able to lift 50 pounds. I have picked up many boxes at work during my 28 years there, but never anything that heavy . . . .)

EEOC Intake Questionnaire (Document #40-2 at 111). During the exercises, Laliberte observed Whitten's heart rate and blood pressure, both because they can contribute to falls and because high

blood pressure and maximum heart rate can contribute to a cardiac event. Laliberte Dep. 79-81, 81-83, 116.  Peter Hyman, M.D.  oversaw Laliberte's examination, but he was not involved in its development or application.  Hyman Dep. 14-15.

In Laliberte's final report, he found that Whitten was a "high fall risk, high injury risk, secondary to her congenital defects and severely deconditioned state" in 70-80% of all job functions. Laliberte Dep. 87, 88 and Laliberte EXH. 4. Based on the result of the WCE, Laliberte concluded that Whitten posed a significant threat to her own health and safety, and that she was a high fall risk, unless several factors came together to reduce her to a mild to medium fall risk. Laliberte Dep. 87-88, 92-93 and Laliberte EXH. 4.  Laliberte's evaluation also included recommendations to limit Whitten's assignments to a ten-mile vicinity, "sign in daily at the departmental time keepers (sic) office at a set time to unsure (sic) the employee is "Safely" (sic) at work," assign a parking space that would allow Whitten to access her office building without having to step over a curb, and make some modifications to Whitten's workstation and chair.  ECF #40-8 at 64-68.  In addition, Laliberte felt she needed, at a minimum, a scooter.  Laliberte Dep. 84. He also felt Whitten needed to attend physical therapy to see if she could improve her strength and stability. Laliberte Dep.  84, 87. Laliberte would not clear Whitten to work unless all of his restrictions could be accommodated and/or her strength and conditioning improved to lessen her fall risk.[4] Laliberte Dep. EXH. 4.

---

[4]The EEOC notes that the same day as the examination, Laliberte emailed Octavia Williams-Blake, Associate Vice President of Occupational Health, stating, Whitten "is a 'Mild to Moderate' fall risk because of ankle weakness and severe decondition (sic) state but she is capable of preforming (sic) 70-80 of her essential job demands to include lifting and carrying up to 40 lbs without an assistance device 20-30 feet. Her performance places her in the 'Light' work classification according to the US department (sic) of Labor standards." Document stamped MCLEOD-C-000388 (Ex. C to Pl. Resp.).  However, Laliberte explained in his deposition that this was his conclusion if all recommended accommodations could be met (including his recommendation of limiting her to a 10 mile radius). Laliberte Dep. 114.

Laliberte did not seek Whitten's input in creating his recommendations.  Laliberte Dep. 94-95; Whitten Dep. 90-91, 144; Whitten Decl. ¶ 4 (Ex. N to Pl. Resp.).

### F.    Defendant's Accommodation Process

On August 3, 2012, Associate Vice President Williams-Blake asked Whitten to complete a reasonable accommodation form "so that a committee could look at [her] functional capacity test, the recommendations of [Laliberte], and any requests that [she] had for accommodations, and rule on [her] coming back to work." EEOC Intake Questionnaire (Document #40-2 at 111). Whitten was concerned that if she filled out the form, "any requests [she] made would be used against [her]." EEOC Intake Questionnaire (Document  #40-2 at 111); Whitten Dep. 165-166.  Williams-Blake recalls Whitten expressing concerns, but recalls more specifically that Whitten was concerned with Laliberte's recommendation that she needed a scooter to perform her job. Williams-Blake Dep. 45-46. Further, Whitten expressed concerns over the expense of a scooter and a vehicle that could carry it, as well as her ability to get it in and out of the car.[5]  Williams-Blake Dep. 45-46, 53, 56-57. Williams-Blake advised during this call that if Whitten felt the restrictions imposed by Laliberte were not correct, she should get her doctor to provide his or her opinion so the accommodation committee could consider it. Williams-Blake Dep. 46 and Williams-Blake EXH. 6.

Despite her concerns, Whitten completed the form and included four accommodation requests:  (1) "Have [Laliberte] assist with selecting an appropriate assistive device or devices;" (2) "Have access to park my car where there is no curb;" (3) "Replace my desk chair with one that has adjustable-height arms . . .;" and (4) "Limit walking and standing as much as possible (not as much of an issue if I have a scooter or power chair)."  Documents stamped MCLEOD-C-000402-000405

---

[5]Whitten also raised the same concerns over needing Defendant to purchase the scooter and then a car capable of carrying it with Laliberte.  Whitten Dep. 106-107.

(Ex C. to Pl. Resp.); Whitten Dep. 81-82; Whitten Decl. ¶¶ 5-6. Defendant did not discuss Whitten's requests with her. Whitten Decl. ¶ 7.

Upon receipt of Whitten's accommodation request form, Williams-Blake discussed its contents with Carr, Swindler, Dr. Hyman, Pittard, Laliberte, and Kim McCracken, the Director of Employee Health. Williams-Blake Dep. 57-58, 59, 78. The Committee determined that Whitten's requested accommodations, taking into account Laliberte's restrictions, would not permit her to perform all essential functions of her job. Williams-Blake Dep. 62-64 and Williams-Blake EXH. 6; Swindler Dep. 71-73; Carr Dep. 45. Removing the mobility aspects of her position would eliminate the very purpose of the job. Swindler Dep. 72-73. The job specifically required going to events within a 100 mile radius and once there, navigating to conduct interviews and take photographs.[6] Swindler Dep. 72-73; Whitten Dep. 56, 99-102; Carr Aff. ¶ 2. Accordingly, Defendant offered Plaintiff the accommodations of a medical leave of absence along with assistance in seeking short-term disability benefits[7] and the opportunity to seek a job transfer to a position where the workplace restrictions could be accommodated. Letters to Whitten from McLeod (Document #40-2 at 131-132).

### G.    Defendants' Requests for an Opinion from Whitten's Doctor

Williams-Blake advised Whitten, for a second time, that if she or her doctor felt that the restrictions imposed were not correct, to have her doctor provide an opinion letter and the Committee

---

[6]Defendant advised Whitten it could accommodate the other requests. Letters to Whitten from McLeod (Document #40-2 at 131-132); Whitten Decl. ¶ 8.

[7]Liberty Mutual, Defendant's disability benefit carrier, denied Whitten's application, finding she did not meet the policy's definition of "disabled," that she had had the condition since birth and there had been no change noted in her condition, and noting that her position is mostly sedentary. Documents stamped MCLEOD-D-000274-000275 (Ex C to Pl. Resp.).

would factor it into the analysis. Williams-Blake Dep. 63-64. Williams-Blake and others reminded Whitten on several occasions that if she wanted to provide input from her own physician, Defendant welcomed the additional information to guarantee they were making the right decision. Williams-Blake Dep. 46-47, 47-48, 59; Whitten Dep. 134-35. For example:

Around August 8, 2012, Whitten asked Williams-Blake to send her primary care physician, Dr. Maroney, Laliberte's report. Simultaneously with sending the report, Williams-Blake again told Whitten that if her doctor had a differing medical opinion, to have her doctor send a letter to Occ. Health and her accommodations and restrictions could be reassessed. Whitten Dep. 92-94, 95-96 and DFT. EXH. 6.

Around August 13, 2012, Carr called Whitten and informed her they would be sending her paperwork regarding the Committee's accommodation decision and her subsequent leave options. Carr explicitly told Whitten she could request to retake the exam and ask to be reconsidered to return to her former position. Carr also told her that if she provided a differing medical opinion, Defendant was prepared to substitute its current opinion on Whitten's limitations and restrictions. Whitten Dep. 132-33 and DFT. EXH. 1; Carr Dep. 35-36, 38-39.

Also on August 13, 2012, Valerie Johnson, HR, told Whitten that whenever her doctor was ready for her to come back to work, to provide paperwork and Defendant would review any remaining restrictions. Whitten Dep. 133, 134, 135 and DFT. EXH. 1.

On August 15, 2012, Carr reiterated that if her situation changed or her restrictions changed to please notify Defendant immediately. The letter again informed Whitten that Defendant would use her doctor's opinion to re-assess her application to open positions and possibilities for workplace accommodations. Whitten Dep. 97-98 and DFT. EXH. 7.

Carr also had multiple conversations with Whitten, each time requesting input from her

physicians. Carr also told her that she could retake the exam with the intent of coming back to work, to no avail. Carr Dep. 49-50, 51, 53-54.

On January 8, 2013, Carr sent Whitten a communication advising Whitten that she was about to exhaust all leave available to her under Defendant's policies and encouraging her to notify HR immediately if her situation changes or if she has a change in her workplace restrictions. She again specifically told Whitten that Defendant would review the indicated changes for continuing assessment for application to open positions and for any possible workplace accommodations. Document stamped McLeod–O–000026 (Ex. H to Def. Motion).

### H.    Whitten's Efforts to Find Another Position with Defendant

After placing Whitten on involuntary, unpaid leave, Defendant assigned a recruiter, Karen Kaercher, to assist Whitten with finding open positions at McLeod. According to Kaercher, she encouraged Whitten to continually monitor Defendant's website for positions, which Whitten did. Kaercher Dep. 19. In the event Whitten found a position, she would have been required to apply, and would have been required to compete for the position if anyone else submitted an application. Kaercher Dep. 13-14, 44. Whitten would also have been required to accept the new position's pay rate, which was likely to be below her current income. EEOC Intake Questionnaire (Document #40-2 at 112). During the six month period Whitten worked with Kaercher, Whitten saw no open positions with duties comparable to the Communications Specialist position. Nevertheless, Whitten brought at least two positions to Kaercher's attention, a Monitor Technician position and a receptionist position at the health and fitness center.  Kaercher Dep. 24, 28-29, 43.  However, Whitten did not apply for these positions because the pay grades for the positions were all below her

previous pay. Whitten Dep. 116-18, 119; Carr Dep. 58-61, 62-64.[8]

Having found no alternative position, and on the advice of the EEOC, in December 2012, Whitten considered re-taking the functional capacity examination.  Whitten Dep. 111. Whitten decided not to, however, when told the re-examination would be comprehensive and last six hours. Whitten Dep. 112. According to Occupational Therapist Laliberte, Whitten spoke with him about re-taking the functional capacity examination, and told him "that she wanted to retake the same test she had taken earlier this year and that she did not want to take a broader test."  Document stamped MCLEOD-C-000329 (Ex C. to Pl. Resp.). Laliberte relayed that information to Associate Vice President Williams-Blake, who advised Laliberte that any re-examination would be "a Work Capacities to determine what [Whitten] can do physically," and that it would not be for any specific job.  Document stamped MCLEOD-C-000314 (Ex. C to Pl. Resp.).

I.    **Whitten's Charge of Discrimination**

Whitten voluntarily contacted the EEOC to file a charge of discrimination based on disability on September 28, 2012.  EEOC Intake Questionnaire (Document #40-2 at 105-132); Whitten Dep. 15-16.  According to Whitten, "Since my recent falls did not occur at work, I was unsure about the legality of their requiring me to take [the functional capacity] test, but I didn't feel that I had a choice (and I was not offered one). I was also afraid that the results of the test would be used as a pretext to discharge me from my job."  EEOC Intake Questionnaire (Document #40-2 at 111).

J.    **Defendant's Termination of Whitten**

Defendant's policy during the relevant time provided that a leave of absence could last no

_____

[8]In response to Carr's letter notifying Whitten that her leave was about to expire, Whitten's attorney referenced her interest in the Monitor Technician position. Document stamped MCLEOD-E-000413 (Ex. C to Pl. Resp.).  However, she does not present any evidence that she actually applied for any position.

-15-

longer than six months. Document stamped MCLEOD-A-000063 (Ex. C to Pl. Resp.). Defendant terminated Whitten effective February 13, 2013, once she had been on an involuntary, unpaid leave of absence for six months. Document stamped MCLEOD-O-000023 (Ex. C to Pl. Resp.). Defendant identified the reason for Whitten's termination as "TERM MISC-DISABILITY." Document stamped MCLEOD-E-000412 (Ex. C to Pl. Resp.). During her deposition for this action, Whitten testified that she believes she was terminated for her political views and because of a personality conflict. She believes the disability issue was just pretext. Whitten Dep. 147-148, 166-169 and DFT. EXH. 11.

## III.  STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, the moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Id. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-

75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

Plaintiff raises two claims in this action. First, Plaintiff alleges that Defendant subjected her to illegal medical examinations in violation of the ADA, 42 U.S.C. § 12112(d)(4)(A). Second, Plaintiff alleges that Defendant terminated her employment because of her disability in violation of the ADA. Each claim will be discussed in turn.

### A.    Medical Examinations

The ADA provides that "[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). This statute can essentially be broken into two prohibitions: a covered entity shall not require medical examinations (1) to determine whether an employee is an individual with a disability or (2) as to the nature or

-17-

severity of a disability. The focus in this case is on the second prohibition in this statute regarding medical examinations into the nature or severity of a disability.[9]

It is undisputed that Defendant employed Whitten and that it subjected her to a two-part medical examination. Accordingly, the burden shifts to Defendant to show that the examination meets the exception set forth in the statute. That is, that the examination was job-related and consistent with business necessity. See 42 U.S.C. § 12112(d)(4)(A) ("unless such examination or inquiry is shown to be job-related and consistent with business necessity"). The phrase "job-related and consistent with business necessity" is not statutorily defined. The Fourth Circuit has deferred to the EEOC's interpretation for clarification of the phrase. See Porter v. U.S. Alumoweld Co., 125 F.3d 243, 246 (4th Cir. 1997)(relying on EEOC regulations and Technical Assistance Manual). "Generally, a disability-related inquiry or medical examination of an employee may be 'job-related and consistent with business necessity' when an employer 'has a reasonable belief, based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition.'" EEOC, Enforcement Guidance: Disability-Inquiries and Medical Examinations of Employees Under the ADA, No. 915.002 (July 27, 2000). See also 29 C.F.R. § 1630, App. § 1630.14(c) ("[t]his provision permits employers to make inquiries or require medical examination when there is a need to determine whether an employee is still able to perform the essential functions of his or her job."); Porter, 125 F.3d at 246; Thomas v. Corwin, 483 F.3d 516, 528 (8th Cir. 2007) (finding employers

---

[9]Defendant first argues that this statute is inapplicable here because Defendant knew about Plaintiff's disability and was not attempting to uncover any hidden or unknown disabilities. However, that is clearly not the only type of medical examination contemplated by this statute, and, thus, the cases cited by Defendant for this proposition, see Def. Mem. pp. 18-19, are inapplicable and Defendant's argument is without merit.

are permitted "to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims," and fitness for duty exams are considered a reasonable means of making such determination). Both parties agree that this guidance is the appropriate framework for determining whether an exam is job-related and consistent with business necessity.

Before determining whether Defendant had a reasonable belief, based upon objective evidence, that Whitten's ability to perform the essential functions of her job were impaired by a medical condition, the court must determine what the essential functions of Whitten's job were. The Fourth Circuit has defined "essential functions of a job" as "functions that bear more than a marginal relationship to the job at issue." Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 213 (4th Cir.1994) (quoting Chandler v. City of Dallas, 2 F.3d 1385, 1393–94 (5th Cir.1993)).[10] "This definition accords with the general definition from the regulations: 'The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position.'" Stephenson v. Pfizer Inc., 49 F. Supp. 3d 434, 439 (M.D.N.C. 2014) (citing 29 C.F.R. § 1630.2(n)(1) (2014)).

At issue here is whether the ability to safely traverse across the various McLeod campuses was an essential function of Whitten's job. The regulations provide guidance as to the evidence that is relevant in determining essential job duties:

> (3) Evidence of whether a particular function is essential includes, but is not limited to:
>> (i) The employer's judgment as to which functions are essential;

---

[10] The Tyndall court addressed the essential functions issue in an ADA failure to accommodate context, that is, whether an employee can perform the essential functions of his or her job with reasonable accommodation. Tyndall, 31 F.3d at 213. However, the undersigned sees no reason why the same analysis would not apply here.

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3). Swindler, Whitten's supervisor, testified that Whitten's responsibility as a Communications Specialist "was to be a writer/editor/reporter for the 'McLeod News,' [and] to support the functions of the team with other duties as assigned, which would have been marketing communications." Swindler Dep. 15. She testified that her "primary responsibility was for her to produce internal news that related the stories of our hospital or people to a lot of our internal audiences." Swindler Dep. 15. In describing how Whitten was to generate content for McLeod News, Swindler testified

> Every Monday we had a staff meeting. Our staff would report on the different actions going on with the different service lines. It was an expectation that Celia as the editor of "McLeod News" would check and see what was going on, attend functions, maybe get some information from those functions, really harvest the information, just like a reporter would.
>
> You know, reporters often have beats. So they go out on those beats, and they talk; and they see what's going on and find out what's newsworthy and bring it to the attention and make creative suggestions that are involved in the development of a story idea and something that would be interesting to the readership.
> * * *
> I think "harvesting is a good word . . harvesting of news stories, fresh ideas, photography to accompany those stories.
> * * *
> My expectations were that she would come up with the news items, fresh ideas, stories, find patient testimonials, engage in interviews, you know, cover the organization's growth, you know. The skill set wasn't, you know, based on regurgitation. My expectation was that she would, again, find new facets of information and – and, again, tell a story.

Swindler Dep. 18-19, 21.

With respect to the physical requirements of Whitten's job, Swindler testified,

> The physical requirements was to actually navigate to and from those areas in which the event or interviews were occurring to be able to go from, you know, interview to interview, whether it was inside on the lawn, at health fairs, or at the different facilities or, you know, navigate through the buildings to get to the source of where that story was occurring, where that interview was occurring, or where that photograph needed to be shot.

Swindler Dep. 29.

The written job description for a Communications Specialist, which was written by Whitten in 2005, Whitten Dep. 76-77, includes under the heading "Essential:"

> A.  Creates and develops article ideas and graphics or photographs appropriately and timely for each issue of the newsletter, working with Administration in topic selection for each issue. Seeks input from departments through requests for information.
>
> B.  Interviews and accurately writes, and edits copy to produce informative articles. . . . .

Whitten Dep. DFT EXH. 2. Although the job description does not expressly include the requirement that a communications specialist travel to various events or parts of the McLeod campuses to develop story ideas or conduct interviews, "the absence of a purported essential function from a posted job description is not dispositive." Stephenson v. Pfizer Inc., 49 F. Supp. 3d 434, 440 (M.D.N.C. 2014) (citing Rohan v. Networks Presentations LLC, 375 F.3d 266, 279 n. 22 (4th Cir.2004)). Furthermore, both Swindler and Whitten agreed that the proper way to conduct these duties was to travel to the source of the information. Swindler testified that her "instructions were that [interviewing sources in person] was the part of how you gained information." Swindler Dep. 43.[11] Whitten testified that it was her belief that it was better to "harvest" a story in person and that a story is better when she interviews people in person "because you get more from them when you

---

[11]In arguing that mobility was not essential to Whitten's position, the EEOC cites to one incident just before Whitten left, when Swindler told Plaintiff not to interview a doctor in person. Whitten Dep. 73. Swindler explained that they were up against a deadline on that particular instance and told Whitten it would be quicker to obtain the interview via the telephone. Swindler Dep. 42.

do that in person." Whitten Dep. 70, 73. Whitten also agreed that "the physical requirements for a communication specialist require the ability to safely navigate marketing department functions to include, but not limited to, outside in parking lots, grassy areas and walking in a wide variety of areas in order to obtain photographs and interviews." Whitten Dep. 56; see also Whitten Dep. 56, 70, 73-74, 74-77, 89-102.

Given that both Whitten and her supervisor, Swindler, believed that being able to navigate safely around McLeod campuses and outside events in order to obtain story ideas and interviews and photographs, was an essential, rather than marginal, function of her job, the court concludes the same.

Thus, the next question in determining whether the medical exam given to Whitten was job-related and consistent with business necessity is whether Defendant had a reasonable belief, based on objective evidence that Whitten's ability to perform essential job functions would be impaired by a medical condition. EEOC, Enforcement Guidance: Disability-Inquiries and Medical Examinations of Employees Under the ADA, No. 915.002 (July 27, 2000). See also 29 C.F.R. § The requisite reasonable belief "must be based on objective evidence obtained . . . prior to making a disability-related inquiry or requiring a medical examination." Id.

The record reveals that, between April and July of 2012, Plaintiff experienced three falls which caused some sort of injury. In April of 2012, Whitten fell after tripping on a Cypress tree root had to be taken to the Emergency Room via an ambulance. Whitten appeared for work with stitches in her face. Whitten Dep. 37, Document stamped McLeod–C–000053 (Ex. H to Def. Motion). In May of 2013, Plaintiff fell when she caught her toe on a mat while entering one of Defendant's facilities and twisted her foot. Whitten Dep. 61; EEOC Intake Questionnaire (Document #40-2 at 109); Document stamped McLeod–D–000100-101 (Ex. H to Def. Motion). On July 11, 2012,

-22-

Whitten was leaving a local restaurant during her lunch break when she caught her foot on a rug and fell, causing a large bruise and swelling to her arm and hand. EEOC Intake Questionnaire (Document #40-2 at 109); Pittard Dep. EXH. 3. Swindler was aware of each of these falls as well as other, earlier falls. Swindler Dep. 57-58, 83. Whitten also communicated to Swindler her own concerns about falling. Swindler Dep. 52.

In addition to Swindler's knowledge of Whitten's recent falls, she had also observed a decline in Whitten's work performance and physical condition. Whitten was failing to produce and meet deadlines even though Swindler had already reduced her workload and asked other employees to help support McLeod News, which was supposed to be only Whitten's responsibility. Swindler Dep. 23, 35. Swindler also began receiving complaints that Whitten was avoiding performing certain aspects of her work; instead of going to do the interviews and stories herself, she would ask others to write something and send it to her with some photographs. Swindler Dep. 31, 35, 39-40; Whitten Dep. 154. Coworkers specifically complained that Whitten was enlisting them to do her job on top of their own responsibilities. Swindler Dep. 35, 39-40.Swindler addressed her performance concerns, both with Shannon Carr in Human Resources and directly to Whitten, on multiple occasions. Whitten Dep. 152-53 and DFT. EXH. 12; Swindler Dep. 47-48, 60-61.

Swindler also observed that Whitten was frequently absent; and, when she was at work, she was winded, flushed, unkempt, and/or clammy. Swindler Dep. 31-33. Her walk was visibly labored and unstable, and she was often found sweaty, wet, and winded after walking mere feet. Swindler Dep. 32, 40. Swindler testified that others observed Whitten getting drowsy and nodding off during staff meetings and that she received multiple complaints from Whitten's co-workers that she was sleeping on the job. Swindler Dep. 32.

As stated above, Swindler had previously expressed her concerns about Whitten to Shannon

Carr in Human Resources.  After her fall on July 11, 2012, Swindler again contacted Shannon Carr in Human Resources to seek guidance on how to proceed. Carr recommended they speak to Octavia Williams-Blake, the Associate Vice President of Occupational Health, to see if she agreed a fitness for duty was merited. Swindler Dep. 60-62; Carr Dep. 19, 20-22, 23-25; Williams-Blake Dep. 22. Swindler explained what she had witnessed the drop in job performance; avoidance of doing the in-person interviews and photographs; the frequency of Whitten's falls; Whitten's observed instability; and Whitten's own communicated concerns about her ability to navigate. Swindler Dep. 52; Williams-Blake Dep. 22.  Williams-Blake was already familiar with Whitten due to previous interactions she had with her. Williams-Blake Dep. 23-24, 25-26. Williams-Blake discussed the information reported from Swindler, together with her own knowledge of Whitten's impairment and history of falls at work, with Michelle Pittard and/or Dr. Hyman and they agreed a fitness for duty was merited.  Williams-Blake Dep. 22; Carr Dep. 19-20; Swindler Dep. 59.

The EEOC argues that an issue of fact exists as to whether Swindler actually observed a performance or physical decline in Whitten since Swindler is the only one who testifies to it. However, the EEOC  presents no evidence to the contrary.  Further, Swindler did not make the decision to send Whitten for a fitness for duty exam.  She along, with Carr, discussed their concerns with Williams-Blake who, in turn, discussed those concerns along with her own knowledge of Whitten's health, with either Pittard, a nurse practitioner, or Dr. Hyman, the medical director of Occupational Health, or both, who made the ultimate decision that a fitness for duty examination was appropriate.  Based upon the objective[12] evidence presented to them, Pittard and/or Dr. Hyman's,

---

[12]See Pence v. Tenneco Auto. Operating Co., 169 F. App'x 808, 812 (4th Cir. 2006) (noting that because the inquiry was an objective one, the court need not resolve any dispute about any subjective motivations by the employer for having the employee examined).

belief that Whitten's ability to perform her essential job functions could be impaired by her medical condition was reasonable.[13]

Next, Plaintiff argues that the scope of the exam exceeded the scope allowed by the ADA. Under the ADA, the scope of an employer initiated medical exam must remain appropriately narrow. James v. Goodyear Tire & Rubber Co., 354 Fed.Appx. 246, 249 (6th Cir. 2009); Conroy v. New York State Dept, of Correctional Serv., 333 F.3d 88, 97-98 (2d Cir. 2003) (holding an employer must show that "the examination . . . is no broader or more intrusive than necessary."). It is generally recognized that the exam must be no broader than necessary and should be restricted to discovering only whether the employee can continue to safely fulfill the essential functions of the job. James, 354 Fed.Appx. at 249; Sullivan v. River Valley School Dist., 197 F.3d 804, 811-13 (6th Cir. 1999); Tice v. Centre Area Transp. Authority, 247 F.3d 506, 515 (3rd Cir. 2001); Allen v. Baltimore Cnty., Md., No. CCB-13-3075, 2015 WL 1260705, at *13 (D. Md. Mar. 17, 2015); Terry v. City of Greensboro, No. 1:02CV00221, 2003 WL 151851, at *4 (M.D.N.C. Jan. 17, 2003); EEOC Compliance Man. (BNA), 902:0190 (November, 2002) (stating, while discussing return to work examinations, that "[a]ny inquiries or examination, however, must be limited in scope to what is needed to make an assessment of the employee's ability to work . . . .").

Both Pittard and Laliberte testified that they designed their portions of the test to measure only Whitten's capabilities to perform the essential functions of her job. Pittard testified that she designed her individualized assessment of Whitten specifically to determine what was causing

---

[13]Defendant also argues that it had reasonable belief, based upon objective evidence, that Whitten "pose[d] a direct threat due to a medical condition." EEOC, Enforcement Guidance: Disability-Inquiries and Medical Examinations of Employees Under the ADA, No. 915.002 (July 27, 2000). Because the undersigned finds a reasonable belief that Whitten might be unable to perform the essential functions of her job due to a medical condition, it need not address the "direct threat" prong.

Whitten to fall and to assess whether she was able to perform her job duties in light of the falls. Pittard Dep. 10, 21-23, 27-28, 29, 30-31. As part of the general consultation before the exam began, Whitten voluntarily explained that she suffered from congenital birth defects. Pittard Dep. 19-21, 33-34 and EXH. 3; Whitten Dep. 53-54. Pittard testified that she examined Whitten's lungs, heart, joints, upper body, hearing, and neurological and psychiatric functioning by performing minor, non-invasive observations, because an issue with any one of the aforementioned areas can contribute to falls. Pittard Dep. 10, 21-23, 27-28, 29, 30-31.

Likewise, the functional capacity portion of the exam performed by Laliberte was done to assess whether Whitten could perform each aspect of her job. Prior to the actual functional capacity portion of the exam, Laliberte interviewed Whitten's supervisor to better understand the expectations of someone in Whitten's position. Swindler Dep. 63-65; Laliberte Dep. 22, 47. Upon arriving at the exam, Laliberte interviewed Whitten to gather her subjective input on what she believed were her physical job demands. Laliberte asked Whitten what she was required to carry on a daily basis to perform her job and weighed the respective objects. Laliberte restructured his portion of the exam based upon the information provided to him by Whitten. Laliberte 36-37, 47-48, 58, 69-70, 78. Whitten recalls only discussing the writing portion of her job, but testified that "we could have discussed others. I'm not–I don't remember." Whitten Dep. 69. Whitten admits that Laliberte did not perform invasive testing of any kind. Whitten Dep. 80.

Plaintiff argues that a genuine issue of material fact exists as to whether Pittard's and Laliberte's examinations were limited to determining whether Whitten could perform her job. Plaintiff argues that "Pittard approached the fitness for duty examination believing Whitten's position required the 'physical ability to safely navigate marketing department functions' and the ability to enter and exit buildings. A reasonable jury could therefore conclude that the exam was not

-26-

designed nor conducted within the limitations set forth by the ADA." Pl. Resp. 24-25 (citing Pittard Dep. 34-35). However, as discussed above, mobility was an essential function of Whitten's job. Whitten agrees that this job description was, in fact, an accurate description of the job. Whitten Dep. 56. Plaintiff also argues that because Whitten informed Pittard that her falls were a result of her congenital defects, Pittard should have discontinued the exam. Plaintiff further argues that Pittard undertook an "intrusive examination" of Whitten's systems and functions that have no relationship to Whitten's falls. With respect to Laliberte, Plaintiff argues that his exam, which included requiring Whitten to carry up to thirty-eight pounds before discontinuing the exam because of her elevated heart rate and blood pressure, exceeded the scope of an exam that should have been based on Whitten's job functions.

Pittard and Laliberte agreed that the exams were relevant to whether Whitten could perform the essential function of navigating to and from the various locations necessary to harvest a story or conduct an interview or take photographs. Pittard Dep. 21-31; Laliberte Dep. 59-82, 117.[14] Defendant argues that Plaintiff has presented no testimony, expert or lay, to contradict these opinions. Plaintiff argues that no expert opinion is necessary and that "most cases analyzing the scope of medical examinations proceed without the aid of an expert." Pl. Resp. 24 n.20. However, Plaintiff does not point to these cases or present evidence sufficient to create a dispute of fact on this issue. Defendant has presented evidence that these medical exams were within the scope of that allowed by the ADA and Plaintiff has failed to present any contradictory evidence. Accordingly, no question for the jury exists.

---

[14] Whitten testified that, as her leave of absence was expiring, the EEOC investigator told her to retake the work capacity exam. Whitten Dep. 172. Defendant argues that it is disingenuous for the EEOC to argue that she should have been allowed to retake an exam they believe was illegal.

For the reasons discussed above, Plaintiff has failed to present evidence sufficient to create an issue of fact as to whether Whitten's exams violated the ADA. Therefore, summary judgment is appropriate on this cause of action.

### B.     Termination

Plaintiff argues that Defendant discriminated against Whitten by placing her on unpaid leave and subsequently discharging her. The ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). Violations of the ADA occur when the employer either wrongfully discharges a qualified individual with a disability or fails to make reasonable accommodations for him. Rhoads v. F.D.I.C., 257 F.3d 373, 387 n. 11 (4th Cir.2001).

The Fourth Circuit has held that the causation and burden-shifting standards applicable in Title VII cases as set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)[15] are also applicable in cases brought pursuant to the ADA "where the defendant disavows any reliance on discriminatory reasons for its adverse employment action." Ennis v. Nat'l Assoc. Of Business and Educ. Radio, 53 F.3d 55, 58 (4th Cir.1995). Under the analysis set forth in McDonnell Douglas, Plaintiff has the initial burden of demonstrating a prima facie case of discrimination. Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d 124, 133 (4th Cir. 2002). If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate,

---

[15]The McDonnell Douglas analysis was refined in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

nondiscriminatory reason for the Plaintiff's discharge.  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)).  In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reason, but was pretext for discrimination.  Reeves, 530 U.S. at 143.

To establish a prima facie case of discriminatory discharge under the ADA, a plaintiff must show that (1) she was a "qualified individual with a disability;" (2) she was discharged; (3) she was fulfilling her employer's legitimate expectations at the time of discharge; and (4) the circumstances of her discharge raise a reasonable inference of unlawful discrimination.  Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir.2001).

Plaintiff argues that Whitten was a qualified individual with a disability.  To be a qualified individual with a disability, an employee must be "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  Plaintiff argues that Whitten had a disability, but was able to perform the essential functions of her job without any accommodation.  Plaintiff argues that Whitten requested accommodations only because she felt she did not have a choice.

Following Laliberte's examination of Whitten, which was done based upon a reasonable belief that Whitten could not perform one of the essential functions of her job, he concluded that she would not be able to return to work unless her assignments were limited to a ten-mile vicinity, she could "sign in daily at the departmental time keepers (sic) office at a set time to unsure (sic) the employee is "Safely" (sic) at work," she had an assigned parking space that would allow her to

access her office building without having to step over a curb, and some modifications were made to her workstation and chair. Laliberte Dep. EXH. 4. In addition, Laliberte felt she needed, at a minimum, a scooter. Laliberte Dep. 84. Whitten requested the following accommodations based upon Laliberte's recommendations: (1) "Have [Laliberte] assist with selecting an appropriate assistive device or devices;" (2) "Have access to park my car where there is no curb;" (3) "Replace my desk chair with one that has adjustable-height arms . . .;" and (4) "Limit walking and standing as much as possible (not as much of an issue if I have a scooter or power chair)." Documents stamped MCLEOD-C-000402-000405 (Ex C. to Pl. Resp.); Whitten Dep. 81-82; Whitten Decl. ¶¶ 5-6. The Committee reviewing Whitten's requested accommodations determined that her requests, taking into account Laliberte's restrictions, would not permit her to perform all essential functions of her job. Williams-Blake Dep. 62-64 and Williams-Blake EXH. 6; Swindler Dep. 71-73; Carr Dep. 45. Removing the mobility aspects of her position would eliminate the very purpose of the job. Swindler Dep. 72-73. The job specifically required going to events within a 100 mile radius and once there, navigating to conduct interviews and take photographs. Swindler Dep. 72-73; Whitten Dep. 56, 99-102; Carr Aff. ¶ 2. Thus, they offered Whitten assistance with obtaining short-term disability benefits and with securing another job at McLeod that could accommodate her restrictions.

However, even before Whitten submitted her accommodations request, Williams-Blake informed her that if she felt the restrictions imposed by Laliberte were not correct, she should get her doctor to provide his or her opinion so the accommodation committee could consider it. Williams-Blake Dep. 46 and Williams-Blake EXH. 6. In addition, as detailed above, even after Whitten was informed that Defendant could not accommodate her requests, she was told on seven or more occasions that she should submit a report or opinion from her doctor if she felt Laliberte's restrictions were not correct.

Under the ADA, Whitten was obligated to jointly engage in the "interactive process" to identify Whitten's precise limitations and any potential reasonable accommodations that could overcome those limitations. 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.2(0)(3). The burden to engage in the interactive process is a dual one, and responsibility for identifying appropriate accommodations is shared between the employer and the employee. Anderson v. Roche Carolina, Inc., No. 4:10-2792-RBH, 2012 WL 368710, at * 9 (Feb. 3, 2012). A party that obstructs or delays the interactive process, or simply fails to communicate by way of initiation or response, is not acting in good faith to find a solution. Id.; Fleetwood v. Harford Systems, Inc., 380 F.Supp.2d 688, 701 (D.Md. 2005); Berkner v. Blank, No. DKC 12-1390, 2013 WL 951562, at *7 (D. Md. March 11, 2013). "Where the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the interactive process." Berkner, 2013 WL 951562, at *7 (quoting Beck v. Univ. of Wi. Bd. of Regents, 75 F.3d 1130, 1136 (7th Cir.1996)). Without input from Whitten's physicians, Defendant could rely only upon Laliberte's medical assessment to identify Whitten's restrictions and potential accommodations. When Plaintiff's leave of absence expired, Defendant has no more information than they did when they initially placed her on leave. Further, it is undisputed that Whitten never put an application into the system in order to apply for open jobs are directed by her recruiter. See Document stamped McLeod–O–000026 (Ex. H to Def. Motion).

Because Defendant offered Whitten the opportunity to correct any restrictions or limitations that she believed to be unfounded, as well as the opportunity to apply for other positions, neither of

which she took advantage of, her claim that Defendant violated the ADA is without merit.[16]

## V.    CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary

Judgment (Document # 40) be granted and this case dismissed in its entirety.

                                           s/Thomas E. Rogers, III
                                           Thomas E. Rogers, III
                                           United States Magistrate Judge

January 21, 2016
Florence, South Carolina

---

[16]It is noted that Whitten told an EEOC investigator during an interview on August 27, 2013, and reiterated during her deposition that she believed Swindler wanted to discharge her because "[Swindler] didn't want me working there any longer because I sometimes disagreed with her on things and she and I had different beliefs about religion and politics and that she wanted somebody that she could control better."  Whitten Dep. 147-48, 168 and EXH. 11.