IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Equal Employment Opportunity Commission, | Civil Action No.: 4:14-3615-BHH |
| Plaintiff, | |
| vs. | **ORDER AND OPINION** |
| McLeod Health, Inc., | |
| Defendant. | |

This action arises out of Cecilia Whitten's ("Whitten") termination with Defendant McLeod Health, Inc. ("Defendant" or "McLeod"). On September 11, 2014, Plaintiff Equal Employment Opportunity Commission ("EEOC") filed this action under Title I of the Americans with Disabilities Act of 1990 ("ADA") and Title I of the Civil Rights Act of 1991, alleging that Defendant subjected Whitten to improper medical examinations and terminated her employment in violation of the ADA. In accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02 D.S.C., this matter was referred to United States Magistrate Thomas E. Rogers, III, for consideration of pretrial matters. The Magistrate Judge prepared a thorough Report and Recommendation ("Report") which recommends that Defendant's motion for summary judgment be granted. (ECF No. 59.) The EEOC filed timely objections to the Report (ECF No. 60), Defendant filed a reply (ECF No. 62), and the EEOC filed a sur-reply (ECF No. 63). For the reasons set forth herein, the Court adopts the Report in part. Specifically, the Court dismisses the EEOC's claim for

1

improper medical examinations *with prejudice* and remands the case for further consideration of the EEOC's wrongful termination claim based on Defendant's remaining arguments for summary judgment.

## BACKGROUND AND PROCEDURAL HISTORY

The Report sets forth in detail the relevant facts and standards of law, and the Court incorporates them and summarizes below only in relevant part. The EEOC filed this matter on September 11, 2014, alleging violations of the ADA. (ECF No. 1.) Specifically, the EEOC alleges that Defendant subjected Whitten to two illegal medical examinations and discriminated against Whitten by placing her on forced medical leave and ultimately discharging her because of her disability. (ECF No. 1 at 4–5.) On August 25, 2015, Defendant moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 40.) After consideration of the response filed in opposition to the motion for summary judgment (ECF No. 44) and Defendant's reply (ECF No. 50), the Magistrate Judge issued a Report recommending that the motion for summary judgment be granted. (ECF No. 59.) The Court has reviewed the objections to the Report, and finds them to be largely without merit. Therefore, it will enter judgment accordingly.[1]

## STANDARD OF REVIEW

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this Court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976).

---

[1] As always, the Court says only what is necessary to address the EEOC's objections against the already meaningful backdrop of a thorough Report of the Magistrate Judge; exhaustive recitation of law and fact exists there.

The Court is charged with making a *de novo* determination of any portions of the Report and Recommendation to which a specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. *See* 28 U.S.C. § 636(b)(1). The Court need not conduct a *de novo* review when a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). In the absence of a timely filed, specific objection, the Magistrate Judge's conclusions are reviewed only for clear error. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005).

## **DISCUSSION**

The EEOC objects to the Report on six grounds, arguing the Magistrate Judge erred in: (1) analyzing the two separate and distinct medical examinations that Defendant subjected Whitten to as a single comprehensive examination; (2) finding the ability to "navigate safely" is an essential function of Whitten's former job; (3) finding Defendant had sufficient reasonable objective evidence to subject Whitten to any medical examination; (4) finding that any medical examination to which Defendant subjected Whitten was proper in scope; (5) finding Whitten frustrated the interactive process by not obtaining a contrary doctor's opinion and by not formally applying for open positions at McLeod; and (6) failing to consider numerous facts in the record challenging the efficacy—and sincerity—of Defendant's efforts to accommodate Whitten prior to discharging her. (ECF No. 60 at 1–2.)

The Court has considered the EEOC's various objections *de novo* and finds them largely insufficient to reject the recommendations of the Magistrate Judge. In his thorough thirty-two page Report, the Magistrate Judge exhaustively detailed the factual background of this matter before engaging in a thoughtful and comprehensive analysis of the EEOC's claims. (ECF No. 59.) He first found that the EEOC "failed to present evidence sufficient to create an issue of fact as to whether Whitten's [medical examinations] violated the ADA." (*Id.* at 28.)

To reach this finding, the Magistrate Judge applied the correct legal standard as set forth in 42 U.S.C. § 12112(d)(4)(A), 29 C.F.R § 1630.14(c), and the EEOC Technical Assistance Manual.[2] He first found that the "two-part medical examination" Whitten was subjected to was "job-related and consistent with business necessity." (*Id.* at 18.) Here, the EEOC first objects that the Magistrate Judge incorrectly assumed that the two medical examinations at issue "constituted one comprehensive examination." (ECF No. 60 at 4.) It argues that because of this error, the Report "necessarily fails to adequately consider [certain] independent issues[;]" specifically, whether Defendant had reasonable objective evidence to subject Whitten to each examination and whether each

---

[2] *See* 42 U.S.C. § 12112(d)(4)(A) ("A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."); 29 C.F.R. § 1630.14(c) ("A covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity."); EEOC, Enforcement Guidance: Disability-Inquiries and Medical Examinations of Employees Under the ADA, No. 915.002 (July 27, 2000) ("Generally, a disability-related inquiry or medical examination of an employee may be 'job-related and consistent with business necessity' when an employer 'has a reasonable belief, based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition.").

examination was proper in scope. (*Id.*) However, the EEOC provides little argument as to how the Magistrate Judge failed in these respects.

Contrary to the EEOC's assertion, the Magistrate Judge thoroughly considered the circumstances and scope of both medical examinations; the first conducted by Michelle Pittard ("Pittard") on July 12, 2012, and the second conducted by Todd Laliberte ("Laliberte") on July 26, 2012.[3] (ECF No. 59 at 5–11, 24–28.) The fact that the Magistrate Judge referred to these examinations as "a two-part medical examination[,]" in no way renders his analysis and findings incorrect. This objection therefore fails.

The EEOC next objects that the Magistrate Judge erred in finding the ability to "navigate safely" is an essential function of Whitten's job as a Communications Specialist. (ECF No. 60 at 5.) In support, it cites deposition testimony in which Whitten stated that she did not think the ability to navigate safely was a requirement of her job. (*Id.* at 5; 40-2 at 63.) The EEOC further notes that the Communications Specialist position description contains no physical requirements. (ECF No. 60 at 6.)

The Fourth Circuit has defined "essential functions of a job" as "functions that bear more than a marginal relationship to the job at issue." *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994) (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir. 1993)). This definition accords with the general definition from the regulations: "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1) (2014). The regulations offer a non-exhaustive list of evidence relevant to

---

[3] The Court will discuss the Magistrate Judge's analysis of the medical examinations further below.

determining whether a job function is essential: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs. *Id.* § 1630.2(n)(3)(i)–(vii).

The uncontroverted evidence shows that these factors strongly favor Defendant. Whitten's supervisor, Jumana Swindler ("Swindler"), testified that being able to navigate safely around McLeod campuses and outside events in order to obtain story ideas and interviews and photographs was an essential, rather than marginal, function of Whitten's job. (ECF No. 40-3 at 15–21; 29.) Whitten herself testified that part of her job description was "to hunt for stories and then harvest the stories[,]" and she agreed that "[i]t's better to do that in person." (ECF No. 44-7 at 32–33.) She testified that while she did "not necessarily" believe it was part of her job to "do it in person," she "believed that was the way to do it." (*Id.* at 33.) The written job description for a Communications Specialist includes under the heading "Essential," "interviews and accurately writes, and edits copy to produce informative articles."[4] (ECF No. 59 at 21.) Although the written job description does not expressly list the ability to navigate safely as an essential function, such an absence is not dispositive. *See Fleetwood v. Harford Sys. Inc.*, 380 F. Supp. 2d 688, 699 (D. Md. 2005) ("The job description, however, is only one piece of evidence and is not dispositive.") (citing 29 C.F.R. pt. 1630, app. § 1630.2(n)).

---

[4] Both Swindler's and Whitten's testimony indicates that interviews would ideally be conducted in person, which would necessarily involve traveling among the McLeod campuses.

Further, the cases cited by the EEOC are not helpful here. In E.*E.O.C. v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 730–31 (5th Cir. 2007), the court affirmed the jury's finding that safe evacuation was an essential function of the job at issue, noting that the EEOC "offered contradictory evidence of [Defendant's] precise points." However, there was no discussion of what the contradictory evidence included. In *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 900 (8th Cir. 2006), the court analyzed whether the plaintiff *could perform* an essential function of the position—it already assumed that the function at issue was essential. Finally, in *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 915 (10th Cir. 2004), the court affirmed the jury's finding that the function at issue was not essential after considering testimony from the plaintiff's treating physician that plaintiff was qualified to perform all of the tasks required for his position. There is no such evidence here.

Thus, based on the evidence in the record, the EEOC has failed to establish that a reasonable jury could find that the ability to navigate safely is not an essential function of the Communications Specialist position. The Court therefore overrules this objection.

The EEOC next objects that the Magistrate Judge erred in finding Defendant had sufficient reasonable objective evidence to subject Whitten to any medical examination, and, therefore, incorrectly concluded that the medical examinations were job-related and consistent with business necessity. (ECF No. 60 at 7.) Specifically, it argues that the Magistrate Judge failed "to consider evidence in the record discrediting Defendant's theory of the case," "improperly weight[ed]" Swindler's testimony, and failed "to consider evidence in the record discrediting Swindler's testimony." (*Id.* at 7–8.)

"The determination of whether a required medical examination is job-related and consistent with business necessity is an 'objective inquiry.'" *Leonard v. Electro-Mech. Corp.*, 36 F. Supp. 3d 679, 686 (W.D. Va. 2014) (quoting *Pence v. Tenneco Automotive Operating Co., Inc.*, 169 Fed. App'x 808, 812 (4th Cir. 2006)). "Accordingly, the court 'need not resolve any dispute about what [an employer's] subjective motivations were' for requiring an examination." *Id.* (quoting *Pence*, 169 Fed. App'x at 812)*.* "Instead, the court need only decide whether the requirement was 'supported by evidence that would cause a reasonable person to inquire as to whether an employee is still capable of performing his job.'" *Id.* (quoting *Nelson v. Thomasville Furniture Indust., Inc.*, No. 1:00-cv-01007, 2002 WL 416374, at *3 (M.D.N.C. Jan. 17, 2002)).

To find that the medical examinations at issue were "job-related and consistent with business necessity," the Magistrate Judge properly considered "whether Defendant had a reasonable belief, based on objective evidence, that Whitten's ability to perform essential job functions would be impaired by a medical condition." (ECF No. 59 at 22.) He noted the undisputed evidence that Whitten had suffered three falls between April and July of 2012, including one that occurred at work. (*Id.*) The Magistrate Judge further recounted Swindler's testimony that she had observed a decline in Whitten's work performance and physical condition. (*Id.* at 22–24.) The EEOC disputes the Magistrate's reliance on this evidence, arguing that he ignored contradictory evidence and improperly assumed Swindler's testimony was credible. (ECF No. 60 at 7–16.)

The Court recognizes that Whitten indeed disputes certain evidence that the Magistrate Judge appears to find undisputed, such as whether Whitten avoided tasks

8

requiring off-campus travel. (ECF Nos. 59 at 23; 60 at 7–16.) However, key evidence remains undisputed. Specifically, Swindler testified that Whitten had particular difficulty meeting deadlines in the last seven months of her employment. Whitten acknowledged that there were "probably" times when the newsletter was late. (ECF No. 40-2 at 90–91.) Swindler also testified that she ultimately recommended a fitness for duty examination for Whitten based on "the frequency of [Whitten's] falls [and] her stumbling." (ECF No. 40-3 at 22.) Whitten confirms this, testifying that when she went to get her fitness for duty, Swindler told her that she "wanted [Whitten] to go to employee health to make sure that [Whitten's] environment was safe for [her]" given her recent falls. (ECF No. 44-7 at 17; 26–27.)

Further, Shannon Carr ("Carr"), a Human Resources employee at McLeod, testified in her deposition that she had several discussions with Swindler as to Whitten's declining health and poor performance. Specifically, Carr stated,

> [Swindler] had pondered in those conversations with me if [Whitten's] performance problems . . . with meeting deadlines were potentially about something that was going on with her health. . . . She'd also shared with me about [Whitten's] falls those last couple of months. And so when we spoke during that July time frame, . . . I had prior knowledge of some recent falls and [Swindler's] concerns about her health; and it really just all came together to show that we needed to check things out with her and make sure that she was safe for work.[5]

---

[5] The EEOC makes much of the fact that there is conflicting testimony as to who ultimately recommended the July 12, 2012 fitness for duty examination. (ECF No, 63 at 3–4.) Octavia Williams-Blake ("Williams-Blake"), the Associate Vice President of Occupational Health at McLeod, testified that she received a "call from [Swindler]" expressing concerns about Whitten's recent falls and "her ability to safely get to different locations to do her stories." (ECF No. 40-4 at 6.) According to Williams-Blake, she then "took that information to Dr. [Peter] Hyman or Michelle Pittard . . . [t]o discuss whether or not they felt a fit[ness] for duty [test] was warranted, and based on the information we had, they did agree that a fit[ness] for duty [test] was needed." (*Id.*) Dr. Hyman, however, testified that he was not "involved in any way" in the July 12, 2012 medical examination. (ECF No. 40-7 at 3.) Pittard also testified that she did not consult with anyone before conducting the medical examination. (ECF No. 40-6 at 4.) Regardless, it is uncontroverted that Swindler, Carr, and Williams-Blake considered the implications of Whitten's recent falls to determine that a medical examination was warranted. Summary judgment is not precluded on this basis.

(ECF No. 40-5 at 6–7.)

Given that it is undisputed Whitten suffered three falls in the span of four months, and her ability to meet deadlines was impaired, the Court concludes that Defendant had reasonable cause to question whether Whitten could still perform the essential functions of her job. The EEOC's arguments that Whitten believed that she was still capable of performing the essential functions of her job and that she received a positive performance evaluation in 2011 are not sufficient to create a genuine issue of material fact on this issue. "Courts have rejected the notion that the business necessity standard cannot be met without showing that an employee's job performance has suffered as a result of the employee's health problems." *Leonard*, 36 F. Supp. 3d at 687 (citing *Brownfield v. City of Yakima*, 612 F.3d 1140, 1147 (9th Cir. 2010) (holding that "the business necessity standard may be met even before an employee's work performance declines if the employer is faced with significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job")).

The EEOC's additional arguments on this issue are also without merit. The EEOC argues that if Defendant had merely asked Whitten the reason for her recent falls, there would have been no need for the medical exams. (ECF No. 60 at 8.) However, the EEOC cites no authority stating that such an interrogation is required, and this argument does not preclude finding summary judgment appropriate here. The EEOC further argues that the Magistrate Judge should have drawn a presumption in the EEOC's favor "that Swindler's testimony is not credible and Whitten's alleged performance issues were not considered by Defendant in its decision to submit Whitten to the first improper

medical examination." (*Id.* at 15.) It cites *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015), in support. In *Jacobs*, the Fourth Circuit Court of Appeals found that the district court "impermissibly 'credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion.'" 780 F.3d at 569 (quoting *Tolan v. Cotton*, 134 S.Ct. 1861, 1867–68 (2014)). Here, the Magistrate Judge did not fail to acknowledge the key evidence in this case. As summarized above, it is undisputed that Whitten fell three times in four months and her performance was beginning to suffer, as evidenced by Whitten's inability to meet deadlines. *Jacobs* is inapplicable here. Accordingly, the Court finds that the independent medical examinations were "job-related and consistent with business necessity" and overrules the EEOC's objections.[6] 42 U.S.C. § 12112(d)(4)(A).

The EEOC next objects that the Magistrate Judge erred in finding that any medical examination was proper in scope. (ECF No. 60 at 16.) Specifically, the EEOC argues that it presented sufficient contradictory testimony demonstrating the medical examinations were overbroad and that it did not need rebuttal expert witness testimony to preclude finding summary judgment appropriate here. (*Id.* at 16–17.)

As correctly stated by the Magistrate Judge, "Under the ADA, the scope of an employer initiated medical exam must remain appropriately narrow." (ECF No. 59 at 25 (citing *James v. Goodyear Tire & Rubber Co.*, 354 Fed. App'x. 246, 249 (6th Cir. 2009);

---

[6] To the extent the EEOC argues that the Laliberte medical examination was also not based on objective evidence, this objection fails. The EEOC provides little argument as to how the Magistrate Judge erred in this respect, other than citing the evidence discussed above. As previously noted, the Magistrate Judge engaged in a thoughtful analysis of the Laliberte medical examination, including the circumstances leading to the examination. Specifically, the Magistrate Judge noted that Pittard believed a more thorough exam was needed based on what she learned in her exam as well as Whitten's history of falling. (ECF Nos. 59 at 7–8; 40-6 at 36–37.) The EEOC has not established a genuine issue of material fact on this issue and the Court overrules this objection.

*Conroy v. N.Y. State Dept, of Correctional Serv.*, 333 F.3d 88, 97–98 (2d Cir. 2003) (holding an employer must show that "the examination . . . is no broader or more intrusive than necessary.")).) "It is generally recognized that the exam must be no broader than necessary and should be restricted to discovering only whether the employee can continue to safely fulfill the essential functions of the job." (*Id.* (citing, e.g., *James*, 354 Fed. App'x. at 249; *Sullivan v. River Valley School Dist.*, 197 F.3d 804, 811–13 (6th Cir. 1999); *Tice v. Centre Area Transp. Authority*, 247 F.3d 506, 515 (3rd Cir. 2001); *Allen v. Baltimore Cnty., Md.*, 91 F. Supp. 3d 722, 738 (D. Md. 2015)).)[7]

The EEOC first argues Defendant knew that the cause of "Whitten's most recent falls . . . were caused by Whitten's congenital condition and nothing more." (ECF No. 60 at 17.) Accordingly, it asserts that the examinations were overly broad because they did not focus on Whitten's condition. (*Id.* at 17–18.) Here, the EEOC appears to argue that Defendant should have accepted Whitten's belief that her falls were caused solely by her condition and would not impact her ability to perform her job. However, "[a]n employer cannot be expected to understand the symptoms and ramifications of the medical conditions of its employees and must be allowed to have such conditions examined by a medical professional." *Johnson v. Goodwill Ind. of E.. N.C., Inc.*, No. 5:97-cv-740, 1998 WL 1119856, at *4 (E.D.N.C. Dec. 17, 1998). Given Defendant's reasonable concern that Whitten might not be able to perform the essential functions of her job, it was authorized to require a medical examination. 42 U.S.C. § 12112(d)(4)(A)–(B).

---

[7] To the extent the EEOC argues that the Magistrate Judge applied the wrong legal standard to this issue, this objection fails. (ECF No. 60 at 17.) Contrary to the EEOC's assertion, there is no requirement here that "an employer [] use all available knowledge of the employee's condition and performance abilities during the exam's implementation to ensure that the exam is proper in scope." (*Id.*) Rather, the appropriate inquiry is whether the medical examinations were limited "to discovering only whether the employee can continue to safely fulfill the essential functions of the job." *James*, 354 Fed. App'x at 249. The Court finds that the Magistrate Judge properly applied this standard here. (ECF No. 59 at 25.)

Relatedly, the EEOC argues that Pittard's fitness of duty examination was too broad because she tested for "blood pressure, cardio issues, stability, neurological issues, [and] passing out"—issues unrelated to Whitten's congenital condition. (ECF No. 60 at 17–18.) Pittard explained that she examined Whitten's "cardiac functions"—including Whitten's blood pressure and possible fainting—because "cardiac can contribute to falls." (*Id.* at 10.) Pittard examined Whitten's joints "[t]o see if she could have mobility issues." (Id. at 11.) Pittard further explained that she only tested Whitten's neurological functions through "general conversation." (*Id.* at 16.) She determined that Whitten was "alert, oriented, [and] knew what was going on." (*Id.*) There is no evidence that Pittard's physical exam went beyond discovering whether Whitten could "continue to safely fulfill the essential functions of [her] job." *James*, 354 Fed. App'x at 249. The EEOC's argument here is therefore unavailing.

The EEOC next argues that Laliberte's examination went far beyond addressing "Defendant's only concern"—"Whitten's ability to safely walk." (ECF No. 60 at 19.) It specifically notes that Laliberte made Whitten "stand on one foot for up to two minutes, squat, kneel, stoop, push, pull, grip, and carry a 38-pound weight." (*Id.*) The EEOC claims that its "divergent readings" on this evidence indicates a genuine issue of material fact. (*Id.*) The EEOC further argues that Whitten's testimony contradicts Laliberte's testimony in that Whitten claims: (1) writing was the only job function she discussed with Laliberte; and (2) Laliberte's examination far exceeded the physical demands she experienced in her job as Communications Specialist. (*Id.*)

13

In his deposition testimony, Laliberte clarified that he prepares for any functional capacity test by "objectively go[ing] [to] find data that is meaningful to the person being able to do their essential job demands." (ECF No. 40-8 at 11.) With respect to Whitten, Laliberte visited her work site to calculate the typical distance she would walk, talked to people in her work environment with similar jobs, and compiled data pertinent to Whitten's essential physical job demands. (*Id.* at 11–14.) Accordingly, Laliberte based his exam on more than Whitten's input and had specific reasons for testing Whitten's ability to perform the essential functions of her job beyond writing.

Laliberte extensively explained the rationale for the various tests he conducted in the functional capacity exam. He first explained that he tested Whitten's ability to stand on one foot to measure her ability to navigate curbs. Specifically, "when you take one foot and you step up, you immediately lose the balance of two feet. You have to stand on one foot, at least a fraction of the time. . . . You're going to have a period between where both feet are on the floor, and you're stepping up. . . . We're simulating that movement pattern. It is essential to the job so she can walk into the building." (*Id.* at 65–66.) Similarly, Laliberte tested Whitten's ability to squat, kneel, and stoop because "that's [an] essential job demand that you physically go pick up your briefcase." (*Id.* at 36–37.) He explained, "we statistically tested [Whitten] for push and pull and grip while she was standing to see what her force controls were" before she was asked "to lift something that simulated a specific tool in her work environment that she might have come in contact with." (*Id.* at 37–38.) He noted Whitten may have to push or pull open a door at

work or push a cart with "distribution flyers or things that you're going to set up as a display that includes cups and stuff and brochures and boxes." (*Id.* at 39–40.)

Laliberte also explained that he tested Whitten's ability to carry up to 38 pounds to "simulate audiovisual equipment, boxes, and purse." (Id. at 34.) He based this weight on Whitten's description of what she carried on the job. Specifically, he determined that the essential job demands for Whitten's position required an ability to lift 50 pounds. (*Id.* at 23.) In making this determination, Laliberte recognized that Whitten's "perception of her job may not have been" a requirement to carry this much weight. (*Id.* at 24.) He explained, however, that "when [Whitten] described what she had to do," he drew conclusions as to how much weight that would involve.[8] (*Id.*)

Contrary to the EEOC's assertion, Whitten's testimony here does not create a genuine issue of material fact as to whether Laliberte's medical exam was appropriately narrow in scope. As described above, Laliberte provided specific, job-related reasons for each of the tests the EEOC disputes. The Court finds that both Pittard's and Laliberte's medical examinations were "appropriately narrow" in scope and overrules the EEOC's objection. See *James*, 354 Fed. App'x at 249. Accordingly, the Court agrees with the Magistrate Judge that the EEOC "failed to present evidence sufficient to create an issue of fact as to whether Whitten's exams violated the ADA" and grants summary judgment on this claim.[9] (ECF No. 59 at 28.)

---

[8] On this issue, the EEOC also points to evidence that Defendant told Laliberte Whitten's position involved "carrying requirements [of] 20 pounds or less." (ECF Nos. 60 at 20; 40-8 at 17.) However, as noted above, Laliberte explained why he found Whitten's job actually required her to carry up to 50 pounds.

[9] The Court does not read the Report as recommending summary judgment here on the basis that the EEOC failed to provide expert testimony on this issue. Rather, the Magistrate Judge found that the EEOC failed to establish a genuine issue of material fact through any contradictory evidence. (ECF No. 59 at 27.) This Court likewise finds no genuine issue of material fact on this issue.

The Magistrate Judge next turned to the EEOC's wrongful termination claim, which alleges that that Defendant discriminated against Whitten by placing her on unpaid leave and subsequently discharging her. (ECF No. 59 at 28.) To assess this claim, the Magistrate Judge first recognized the EEOC's argument that Whitten had a disability, but could still perform the essential functions of her job without any accommodation. (*Id.* at 29.) He then discussed Defendant's and Whitten's efforts to determine Whitten's ability to work at McLeod, and concluded that Whitten failed to engage in the requisite "interactive process." (*Id.* at 29–30.) He found that "[b]ecause Defendant offered Whitten the opportunity to correct any restrictions or limitations that she believed to be unfounded, as well as the opportunity to apply for other positions, neither of which she took advantage of, her claim that Defendant violated the ADA is without merit." (*Id.* at 31–32.)

Here, the EEOC objects that the Magistrate Judge erred in finding that Whitten's wrongful termination claim failed because she did not engage in the requisite "interactive process." (ECF No. 60 at 21.) Specifically, it argues that Defendant's behavior indicated it would have been futile for Whitten to engage in the interactive process, and, therefore, summary judgment should not have been granted on this basis. (*Id.* at 21–22.) It further argues that Whitten was not required to formally apply for vacant open positions under the ADA, and did not violate the interactive process by failing to do so. (*Id.* at 22–23.)

The ADA requires that a disabled employee jointly engage in the "interactive process" to identify the employee's precise limitations and any potential reasonable accommodations that could overcome those limitations. 42 U.S.C. § 12112(b)(5)(A); 29

C.F.R. § 1630.2(0)(3). The burden to engage in the interactive process is a dual one, and responsibility for identifying appropriate accommodations is shared between the employer and the employee. *Anderson v. Roche Carolina, Inc.*, No. 4:10-2792, 2012 WL 368710, at * 9 (Feb. 3, 2012). "A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith." *Id.* (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135–36 (7th Cir. 1996)). "Where the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the interactive process." *Berkner v. Blank*, No. No. 12-1390, 2013 WL 951562, at *7 (D. Md. March 11, 2013) (quoting *Beck*, 75 F.3d at 1136).

However, "Title III explicitly provides that it does not require 'a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization . . . does not intend to comply' with the ADA." *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1136 (9th Cir. 2002) (quoting 42 U.S.C. § 12188(a)(1)). This "futile gesture doctrine is applicable in the ADA context." *Davoll v. Webb*, 194 F.3d 1116, 1132 (10th Cir. 1999). Importantly, the doctrine will apply "[o]nly in the rare case where an employer has essentially foreclosed the interactive process through its policies or explicit actions." *Id.* Moreover, "an employee's subjective belief about the futility of initiating the interactive process will not, by itself, relieve him or her of that obligation." *Id.*

Here, there is conflicting evidence on whether Whitten met her burden of engaging in the interactive process in good faith and whether that caused a failure to

accommodate the disability. Defendant asserts that it repeatedly asked that Whitten submit a report or opinion from her doctor if she felt Laliberte's recommended restrictions were not correct. However, Whitten testified that she believed submitting such a report would be futile because Williams-Blake told her that she could not go back to her position as a Communications Specialist. According to Whitten, Williams-Blake called her on August 8th, "saying that the committee had met and decided that they could meet all of my requests for accommodations except for limiting walking and standing. Therefore, I could not return to my job. She said Shannon Carr . . . would be calling me with options for other jobs and that my salary would not be affected." (ECF No. 40-2 at 112.)

Thus, while Whitten acknowledges that Williams-Blake, Carr, and Valerie Johnson later indicated Whitten could submit a doctor's report opining different restrictions, Whitten believed such a submission would be futile based on Williams-Blake's August 8th phone call. Viewing the evidence in the light most favorable to Whitten, the Court finds there is a genuine issue of material fact as to whether Whitten's failure to submit a doctor's report was an act of bad faith that violated the interactive process. Specifically, a reasonable jury could find that Williams-Blake's statements to Whitten on August 8th indicated that Defendant did not intend to comply with the ADA, thereby invoking the futile gesture doctrine. *See Pickern*, 293 F.3d at 1136.

The Court further finds that Whitten's failure to formally apply for open positions at McLeod is not evidence of her failure to engage in the interactive process. As noted by the EEOC, "the ADA does indeed mandate that an employer appoint employees with

18

disabilities to vacant positions for which they are qualified, provided that such accommodations would be ordinarily reasonable and would not present an undue hardship to that employer." *E.E.O.C. v. United Airlines, Inc.*, 693 F.3d 760, 761 (7th Cir. 2012). Defendant relies on inapplicable case law to argue that the onus was on Whitten to apply for a vacant position. Specifically, in *Marshall v. AT & T Mobility*, 793 F. Supp. 2d 761, 768 (D.S.C. 2011) the court found that the plaintiff could not establish a failure to accommodate claim based on the defendant's failure to award the plaintiff an open position as an accommodation for his disability. *Marshall* does not support the position that the ADA places the burden on the employee to apply for vacant positions for which he or she is qualified. Accordingly, Whitten's failure to apply for open positions at McLeod, even where she was directed to do so, does not establish any failure on her part to engage in the interactive process. Summary judgment cannot be granted on this basis.

Thus, the Court grants the EEOC's objection and finds that summary judgment is not proper on this basis.[10] Because the Magistrate Judge did not address Defendant's other arguments in support of summary judgment on the EEOC's wrongful termination claim, the Court remands this case to the Magistrate Judge. On remand, the Magistrate Judge should consider this claim in light of Defendant's remaining arguments set forth in its motion for summary judgment. (ECF No. 40.)

---

[10] The EEOC lastly objects that the Magistrate Judge failed to consider certain evidence related to its assertion that Whitten's efforts to participate in the interactive process would have been futile. (ECF No. 60 at 23–24.) Because the Court finds that Whitten's alleged failure to participate in the interactive process is not a basis for summary judgment, the Court need not address this objection.

## **CONCLUSION**

After careful consideration of the relevant motions, responses, and objections, the Court adopts the Report and Recommendation in part. It is, therefore, ORDERED that Defendant's Motion for Summary Judgment (ECF No. 40) is GRANTED IN PART and DENIED IN PART. The EEOC's claim that Defendant subjected Whitten to improper medical examinations in violation of the ADA is dismissed *with prejudice*. However, this case is remanded to the Magistrate Judge for consideration of Defendant's remaining arguments for summary judgment on the EEOC's wrongful termination claim.

**IT IS SO ORDERED.**

/s/Bruce Howe Hendricks
United States District Judge

Greenville, South Carolina
March 31, 2016