IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

|  |  |
|---|---|
| Equal Employment Opportunity Commission, | Civil Action No.: 4:14-3615-BHH |
| Plaintiff, | |
| vs. | **OPINION AND ORDER** |
| McLeod Health, Inc., | |
| Defendant. | |

This action arises out of Cecilia Whitten's ("Whitten") termination with Defendant McLeod Health, Inc. ("Defendant" or "McLeod"). On September 11, 2014, Plaintiff Equal Employment Opportunity Commission ("Plaintiff" or "EEOC") filed this action under Title I of the Americans with Disabilities Act of 1990 ("ADA") and Title I of the Civil Rights Act of 1991, alleging that Defendant subjected Whitten to improper medical examinations and terminated her employment in violation of the ADA. In accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02 D.S.C., this matter was referred to United States Magistrate Thomas E. Rogers, III, for consideration of pretrial matters. Summary judgment was previously granted on Plaintiff's improper medical examination claim (*see* ECF No. 64 at 1-15), and the matter was remanded for consideration of Plaintiff's wrongful termination claim and any potential failure to accommodate claim (*see* ECF No. 81 at 3-4). The Magistrate Judge prepared a thorough Report and Recommendation ("Report"), which recommends that Defendant's motion for summary judgment be

1

granted as to the remaining wrongful termination claim. (ECF No. 96.) Plaintiff filed timely objections to the Report, Defendant responded in turn, and Plaintiff filed a reply. (ECF Nos. 97, 99, 100.) For the reasons set forth herein, the Court adopts the Report and grants summary judgment in Defendant's favor.

## BACKGROUND AND PROCEDURAL HISTORY

The Report sets forth in detail the relevant facts and standards of law and the Court incorporates them and summarizes below only in relevant part. On January 1, 2016, the Magistrate Judge entered a Report and Recommendation ("First Report") recommending that Defendant's motion for summary judgment be granted both as to Plaintiff's improper medical examination claim and as to Plaintiff's wrongful termination claim. (ECF No. 59.) The Court entered an Order adopting the First Report as to the improper medical examination claim, but remanding the wrongful termination claim to the Magistrate Judge for consideration of "this claim in light of Defendant's remaining arguments set forth in its motion for summary judgment." (ECF No. 64 at 19.) Defendant filed a motion for reconsideration arguing, *inter alia*, that the Court erred in finding that issues of fact remained as to the wrongful termination claim. (ECF No. 70.) The Court granted the motion for reconsideration in part, vacating the portion of its previous Order relating to Plaintiff's wrongful termination claim, directing further briefing thereupon, and remanding the case to the Magistrate Judge to address the merits of the claim, with particular attention to the role of the futile gesture doctrine, as well as whether a failure to accommodate claim exists and survives summary judgment. (ECF No. 81.) After the parties filed their supplemental briefs, the Magistrate Judge submitted his second Report

and Recommendation on June 19, 2017. (ECF No. 96.) Plaintiff filed its objections to the second Report on July 3, 2017. (ECF No. 97.) Defendant filed a response to the objections on July 17, 2017. (ECF No. 99.) Plaintiff replied on July 27, 2017. (ECF No. 100.)

The Court has thoroughly reviewed the Report, all related briefing, the objections, all relevant responses and replies, and the applicable case law. Case law exists to support both sides of the issue regarding an employer's duty to affirmatively reassign an employee to a vacant position in contravention of the employer's facially neutral requirements that the employee apply for and compete for the position; however, none of the case law is controlling and the issue presents a circuit split. In truth, the theory and analysis pursued by Plaintiff regarding Defendant's allegedly unlawful failure to reassign Whitten has strayed far afield from the wrongful discharge claim actually pleaded in the complaint and has only tangential relevance to the resolution of Defendant's summary judgment motion. Ultimately, the Court finds that Whitten's own conduct during the parties' efforts to find an appropriate reassignment position dictated the result of that process, and the Court will enter judgment accordingly.[1]

## STANDARD OF REVIEW

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this Court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976). The Court is charged with making a *de novo* determination of any portions of the Report

---

[1] As always, the Court includes only what is necessary to address Plaintiff's objections against the already meaningful backdrop of a thorough Report of the Magistrate Judge; comprehensive recitation of law and fact exists there.

and Recommendation to which a specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. *See* 28 U.S.C. § 636(b)(1). The Court need not conduct a *de novo* review when a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). In the absence of a timely filed, specific objection, the Magistrate Judge's conclusions are reviewed only for clear error. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005).

## DISCUSSION

Plaintiff objects to the Report on two grounds, arguing the Magistrate Judge erred: (1) in the legal analysis of and conclusion as to whether the ADA's reasonable accommodation provision requires an employer to affirmatively reassign a disabled employee to a vacant position when the employee satisfies the position's basic qualification standards and expresses a desire for the position; and (2) in applying a flawed reassignment analysis to the facts of this case, resulting in a determination that would not be reached under application of the correct assignment standard. (ECF No. 97 at 1.)

The Court has considered the EEOC's objections *de novo* and finds them unpersuasive and insufficient to reject the recommendations of the Magistrate Judge. In his thorough thirty-one page Report, the Magistrate Judge detailed the factual background of this matter before engaging in a thoughtful and comprehensive analysis of

the EEOC's claims. (*See generally*, ECF No. 96.) As an initial matter, it must be noted that the EEOC acknowledged, in its objections (ECF No. 60) to the First Report, in its supplemental brief (ECF No. 85), and in its instant objections (ECF No. 97) that it has not alleged a separate cause of action for failure to accommodate. Accordingly, the Magistrate Judge correctly determined that no independent failure to accommodate claim exists or survives summary judgment. (ECF No. 96 at 12.)

The EEOC's complaint contains two claims: (1) that Defendant subjected Whitten to illegal medical examinations in violation of the ADA; and (2) that Defendant placed Whitten on forced leave and discharged her on the basis of her disability in violation of the ADA. (ECF No. 1.) After discovery closed and Defendant filed its motion for summary judgment, and after the Magistrate Judge issued the First Report concluding *inter alia* that Whitten's failure to apply to any positions constituted a failure to engage in the interactive process, the EEOC introduced a new theory (*see* ECF No. 60 at 22-23, 25), now prevalent in its objections, that Defendant's failure to accommodate Whitten in the form of automatic reassignment to a vacant position should be viewed as evidence in support of the discriminatory discharge claim (*see* ECF No. 97 at 12).[2] Defendant views the shifting basis for Plaintiff's claims with skepticism, and for good reason. Defendant argues:

> The EEOC, who never pled failure to accommodate, let alone failure to reassign, has now completely shifted its arguments in this case and is trying to backdoor their way into a claim and legal theory never

---

[2] The EEOC's only reference to McLeod's putative failure to reassign Whitten prior to the Magistrate Judge's issuance of the First Report was the following cursory statement in the final paragraph of its opposition brief: "Finally, there is a genuine issue of material fact as to whether Defendant's internal recruiter made a sincere effort to find an alternative position for Whitten. If the factfinder ultimately determines that Whitten needed an accommodation, Defendant would have been obligated to reassign Whitten as a proper accommodation under the ADA. *See, e.g., EEOC v. United Airlines, Inc.*, 693 F.3d 760 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 2734 (2013)." (ECF No. 44 at 35.)

5

contemplated at the outset. What began as an unlawful medical examination case has now, somehow, been converted into a failure to reassign case. While the EEOC seems to finally acknowledge that it never pled a failure to accommodate claim, let alone failure to reassign, it believes it is entitled to pursue a failure to reassign argument as if it had been pled. This is not a reassignment case. It should not be a reassignment case. This is a wrongful discharge case based on an alleged unlawful medical examination, leave, and subsequent discharge. The only reason the Magistrate court felt compelled to consider reassignments was in analyzing whether Whitten was a "qualified individual" under the ADA.

(ECF No. 99 at 4.) The EEOC never sought to amend the complaint to add a failure to accommodate claim and without such an amendment a new claim may not be raised. *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir. 2009) ("We have previously held, along with the Fifth, Sixth, Seventh, and Eleventh Circuits, that a plaintiff may not raise new claims after discovery has begun without amending his complaint.") (citations omitted). In the absence of any failure to accommodate claim in the pleadings, the EEOC's current reliance on a failure to reassign theory is simply an attempt to move the goal posts, a shifting target grafted onto the wrongful discharge claim once the gravamen of Plaintiff's case (the improper medical examination claim and the portion of the wrongful discharge claim that relied upon it) was unsuccessful.

Nevertheless, the Magistrate Judge analyzed the Defendant's alleged failure to accommodate as possible evidence supporting Plaintiff's wrongful discharge claim, as Plaintiff argued the Court should do. (ECF No. 96 at 13.) This analytical rubric considered the failure to reassign Whitten for its limited relevance in determining whether any material issues of fact remain pertaining to the wrongful discharge claim. The Court finds that this approach was proper, and that the Magistrate Judge appropriately construed the claims, the facts, and all reasonable inferences in Plaintiff's favor, as was

the Magistrate Judge's responsibility at the summary judgment phase. Ultimately, the Magistrate Judge concluded that Plaintiff failed to present sufficient evidence to create a genuine dispute of fact as to whether McLeod violated the ADA by terminating Whitten's employment. (*Id.* at 30-31.) Accordingly, the Magistrate Judge recommended that summary judgment be granted as to the wrongful discharge claim. (*Id.*)

A threshold inquiry to the wrongful termination analysis is whether Whitten is a "qualified individual with a disability." (*Id.* at 30.) To be a qualified individual with a disability, an employee must be "an individual who, with or without reasonable accommodation can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The parties do not dispute that Whitten had a disability. To resolve whether a person is a "qualified individual," the Court must consider whether that person is able to perform the essential functions of the job in question, and if not, whether the person could do the job with reasonable accommodation. *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994) (citing *Chandler v. City of Dallas*, 2 F.3d 1385, 1393-94 (5th Cir.1993)).

In his First Report, the Magistrate Judge recommended a finding that the ability to safely traverse across the various McLeod medical campuses was an essential function of Whitten's job. (ECF No. 59 at 22.) The Court overruled Plaintiff's objection to this recommendation and found that Plaintiff failed to establish that a reasonable jury could conclude that the ability to navigate safely is not an essential function of the Communications Specialist position. This portion of the Court's March 31, 2016 Order was not vacated and remains in force. (*See* ECF No. 64 at 7.)

Mr. Todd Laliberte ("Laliberte"), in a functional capacity examination he performed, determined that Whitten was a "high fall risk, high injury risk, secondary to her congenital defects and severely deconditioned state" in 70-80% of all job functions associated with the Communications Specialist position. (ECF No. 96 at 5.) Based on these findings, Laliberte would not clear Whitten to work unless all of the restrictions he proposed—among them, that Whitten's assignments be limited to a ten-mile vicinity—could be accommodated and/or her strength and conditioning improved to lessen her fall risk. (*Id.*) Although Defendant advised Whitten on numerous occasions that any contrary medical opinion would receive due consideration by the accommodation committee, Whitten failed to provide any such opinion that might have indicated her ability to fulfill the duties of a Communications Specialist. (*See id.* at 6-10.) The accommodation committee determined that the restrictions required by Laliberte's report would not permit Whitten to perform all essential functions of her job, because removing the mobility aspects of the job would eliminate the very purpose of the Communications Specialist position. (*Id.* at 6, 15.) The position specifically required going to events within a 100-mile radius and once there, navigating to conduct interviews and take photographs. (*Id.*) The ADA does not require an employer to reallocate job duties that would change the essential functions of the position in question. *Carter v. Tisch*, 822 F.2d 465, 467 (4th Cir. 1987). Accordingly, the Magistrate Judge correctly concluded that Whitten was not able to perform the essential functions of the Communications Specialist job with or without reasonable accommodations. (ECF No. 96 at 14-16.)

Plaintiff appears to have abandoned its reliance on the futile gesture doctrine and

does not challenge the Magistrate Judge's conclusions on this issue in its objections or its reply in support of those objections. Nevertheless, the doctrine requires brief discussion here in light of the fact that the Court remanded the case to the Magistrate Judge specifically to consider the doctrine's applicability *vel non*.

The parties' positions regarding the futile gesture doctrine are as follows: (a) Defendant argues that Whitten was responsible for the breakdown in the interactive process because Defendant, through various actors, told Whitten on no less than six occasions that if she or her medical provider disagreed with Defendant's assessment of her restrictions and limitations, she could submit an alternative opinion and it would be considered; (b) Plaintiff argues that Whitten's failure to obtain an alternative opinion from her doctor should be excused by the futile gesture doctrine because Defendant's conduct, in particular a statement by McLeod occupational health employee Octavia Williams-Blake that Whitten would never return to the Communications Specialist position, essentially foreclosed Whitten from participating in the interactive process. (*See* ECF No. 96 at 18-21.) After outlining the relevant legal standards the Magistrate Judge concluded that Plaintiff cannot meet its burden of showing circumstances surrounding the breakdown in the interactive process that created an objectively reasonable perception that the process was at an end. (*Id.* at 19.)

The Court agrees with this conclusion and adopts the Magistrate Judge's reasoning and findings. Even accepting Whitten's representation that Ms. Williams-Blake stated Whitten would never return to the Communications Specialist position (which McLeod contends never happened), the undisputed evidence demonstrates *numerous*

instances where Whitten was specifically invited to submit a contrary medical opinion in order to obtain a more favorable result from the accommodation committee. The futile gesture doctrine only applies "in the rare case where an employer has essentially foreclosed the interactive process through its policies or explicit actions." *Davoll v. Webb*, 194 F.3d 1116, 1133 (10th Cir. 1999). As explained by the Fifth Circuit Court of Appeals:

> When a breakdown occurs because an employer creates an *objectively reasonable perception* that the process is clearly at an end, the employer is as well placed as the employee to avoid the situation. It knows what it said, and how a reasonable person would interpret it, and thus bears responsibility for salvaging the process. But when an employer's statements do not rise to that level, and the breakdown is caused by the *subjective spin the employee chooses to place on them*, only the employee can prevent the process from collapsing. The employer can hardly be expected to know that the employee is laboring under an unreasonable conviction that further discussion would clearly be futile.

*Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 739 (5th Cir. 1999) (emphasis added). The Court finds that an objectively reasonable person in Whitten's position would not have believed the interactive process to be futile where she was invited, time and again, to submit contrary evidence challenging the characterization of her limitations and restrictions, and was repeatedly assured that any such contrary evidence would receive due consideration.

The next question is whether Whitten is a "qualified individual" with a disability because she could perform the essential functions of her job *with reasonable accommodation in the form of reassignment to a different position*. Reassignment to another position that can accommodate an employee's disability-related restrictions is a reasonable accommodation if the other position is vacant and the employee is qualified to perform the essential functions of the position. *See* 42 U.S.C. § 12111(8) & (9). At the

time of Whitten's leave following the determination that her disability could not be accommodated in her current position, at least two positions for which Whitten could have applied were vacant: a Monitor Technician position and a receptionist position at the health and fitness center. (Kaercher Dep. 24, 28-29, ECF No. 44-13.) The EEOC objects to the Magistrate Judge's legal analysis and conclusion that Defendant did not have an affirmative responsibility to reassign Whitten to a vacant position without requiring Whitten to apply or compete for the position.

The EEOC's reassignment theory in this case is based in large part on its own guidance, which it quotes at length in its supplemental brief:

> The ADA specifically lists 'reassignment to a vacant position' as a form of reasonable accommodation. [Citing, *inter alia*, 42 U.S.C. § 12111(9)(B) (1994); 29 C.F.R. § 1630.2(o)(2)(ii) (1997).] . . . .
>
> . . .
>
> The employer **must** reassign the individual to a vacant position that is equivalent in terms of pay, status, or other relevant factors (e.g., benefits, geographical location) if the employee is qualified for the position. If there is no vacant equivalent position, the employer **must** reassign the employee to a vacant lower level position for which the individual is qualified."
>
> . . .
>
> [Question 29] Does reassignment mean that the employee is permitted to compete for a vacant position?
>
> **No. Reassignment means that the employee gets the vacant position if s/he is qualified for it. Otherwise, reassignment would be of little value and would not be implemented as Congress intended.** [Citing, *inter alia*, 42 U.S.C. § 12111(9)(b) (1994); 29 C.F.R. pt. 1630 app. § 1630.2(o) (1997); S. Rep. No. 101-116, at 31 (1989) ("**If an employee, because of disability, can no longer perform the essential functions of the job that she or he has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and the employer from losing a valuable worker.**").]

11

(Pl.'s Supplemental Br., ECF No. 85 at 6 (quoting EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, No. 915.022, 2002 WL 31994335, at *21 (Oct. 17, 2002) ("the Guidance")) (internal modifications, citations, and emphasis copied verbatim).) Thus, argues the EEOC, "Once Defendant determined Whitten could not perform her former Communications Specialist position with or without accommodation, Defendant had the affirmative duty to place Whitten in a vacant position for which she was qualified without requiring Whitten to formally apply or compete." (*Id.*) Notably, however, the EEOC omitted from its briefing a relevant portion from the very passage of the Guidance that it quoted, which states:

> Assuming there is more than one vacancy for which the employee is qualified, the employer must place the individual in the position that comes closest to the employee's current position in terms of pay, status, etc. If it is unclear which position comes closest, *the employer should consult with the employee about his/her preference before determining the position to which the employee will be reassigned.*

Guidance, 2002 WL 31994335, at *21. This portion of the Guidance envisions situations in which the employer must engage in consultation with the employee before mechanically reassigning her to a position for which she is technically "qualified" because the duties/pay/status of the vacant position(s) are not a clear analogue to her prior position.

The above provisions from the Guidance rely in part on the U.S. Supreme Court's holding in *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). In *Barnett*, a disabled employee who had transferred to a less physically demanding mailroom position after suffering a back injury, and who subsequently lost his job when a more senior employee was allowed to bid on the mailroom position under the employer's seniority system,

brought suit against the employer claiming violation of the ADA by failing to honor his request to be permanently assigned to the mailroom as a "reasonable accommodation." *Id.* at 393-395. The Third Circuit Court of Appeals has helpfully summarized the *Barnett* Court's approach to determining whether reassignment to a vacant position is required:

> It . . . appears that the [Supreme] Court has prescribed the following two-step approach for cases in which *a requested accommodation in the form of a job reassignment is claimed to violate a disability-neutral rule of the employer.* The first step requires the employee to show that the accommodation is a type that is reasonable in the run of cases. The second step varies depending on the outcome of the first step. If the accommodation is shown to be a type of accommodation that is reasonable in the run of cases, the burden shifts to the employer to show that granting the accommodation would impose an undue hardship under the particular circumstances of the case. On the other hand, if the accommodation is not shown to be a type of accommodation that is reasonable in the run of cases, the employee can still prevail by showing that special circumstances warrant a finding that the accommodation is reasonable under the particular circumstances of the case.

*Shapiro v. Township of Lakewood*, 292 F.3d 356, 361 (3rd Cir. 2002) (emphasis added). In *Barnett*, the Court held that "it would not be reasonable in the run of cases that the [re]assignment in question trump the rules of a seniority system." *Barnett*, 535 U.S. at 403. The Court remanded the case for further proceedings to consider the second analytical step, namely, whether "special circumstances warrant a finding that, despite the presence of a seniority system (which the ADA may not trump in the run of cases), the requested 'accommodation' is 'reasonable' on the particular facts." *Id.* at 405.

The Report properly explains how the reassignment situation at issue in the instant case differs from the situation at issue in *Barnett*:

> The context in the present case does not involve a seniority system, but a facially-neutral policy of requiring an individual, including individuals with a disability seeking an accommodation, to submit an application and compete for a vacant position. To be considered for any vacant position,

> Whitten would have been required to apply, and would have been required to compete for the position if anyone else submitted an application. Kaercher Dep. 13-14, 44. The Seventh and Eleventh Circuits have concluded that [the] *Barnett* framework is applicable to facts such as these. *See [E.E.O.C.] v. United Airlines, Inc.*, 693 F.3d 760, 761 (7th Cir. 2012); *United States Equal Employment Opportunity [Comm'n] v. St. Joseph's Hospital, Inc.*, 842 F.3d 1333, [1337] (11th Cir. 2016).

(ECF No. 96 at 23.)

In *United Airlines*, the Seventh Circuit Court of Appeals held that "the ADA . . . mandate[s] that an employer appoint employees with disabilities to vacant positions for which they are qualified, provided that such accommodations would be ordinarily reasonable and would not present an undue hardship to that employer." 693 F.3d at 761. The *United Airlines* court remanded the case to the district court to conduct the *Barnett* two-step analysis with regard to the reassignment policy at issue, in which "employees needing accommodation [were] not placed into vacant positions but instead [were] given preferential treatment." *Id.* at 761, 764. Specifically, the policy "allow[ed] employees needing accommodation to submit an unlimited number of transfer applications, be guaranteed an interview and receive priority consideration over a similarly qualified applicant—that is, if two candidates [were] equally qualified, the employee-applicant seeking accommodation [would] get the job." *Id.* at 761. Although the court made no specific determination regarding the viability of the apply/compete reassignment policy, it clearly distinguished the general concept of a "best-qualified selection policy" from the seniority system at issue in *Barnett*, reasoning that "[w]hile employers may prefer to hire the best qualified applicant, the violation of a best-qualified selection policy does not involve the property-rights and administrative concerns (and resulting burdens)

14

presented by the violation of a seniority policy." *Id.* Moreover, the *United Airlines* court critiqued an earlier Seventh Circuit opinion addressing a post-*Barnett* reassignment issue as "incorrectly assert[ing] that a best-qualified selection policy is essentially the same as a seniority system," because by "equating the two," that prior opinion had "so enlarged the narrow, fact-specific exception set out in *Barnett* as to swallow the rule." *Id.*

In *St. Joseph's Hospital*, the Eleventh Circuit Court of Appeals stated that "the ADA does not require reassignment without competition for, or preferential treatment of, the disabled." 842 F.3d at 1345. The court recognized that the reassignment rubric at issue was a "best-qualified applicant policy" and "[did] not involve a seniority system or a civil service system," but found the *Barnett* framework instructive nonetheless. *Id.* at 1346. Ultimately, the Eleventh Circuit held:

> Requiring reassignment in violation of an employer's best-qualified hiring or transfer policy is not reasonable "in the run of cases." As things generally run, employers operate their businesses for profit, which requires efficiency and good performance. Passing over the best-qualified job applicants in favor of less-qualified ones is not a reasonable way to promote efficiency or good performance. In the case of hospitals, which is this case, the well-being and even the lives of patients can depend on having the best-qualified personnel. Undermining a hospital's best-qualified hiring or transfer policy imposes substantial costs on the hospital and potentially on patients.

*Id.* Embracing a clear anti-preference interpretation of the statute, the court stated that "the ADA only requires an employer allow a disabled person to compete equally with the rest of the world for a vacant position," and it "'was never intended to turn nondiscrimination into discrimination' against the non-disabled." *Id.* (quoting *Terrell v. USAir*, 132 F.3d 621, 627 (11th Cir. 1998).

Likewise, the Eight Circuit Court of Appeals has held that "the ADA is not an

affirmative action statute and does not require an employer to reassign a qualified disabled employee to a vacant position when such a reassignment would violate a legitimate nondiscriminatory policy of the employer to hire the most qualified candidate." *Huber v. Wal-Mart*, 486 F.3d 480, 483 (8th Cir. 2007), *reh'g en banc denied*, 493 F.3d 1002 (8th Cir. 2007), *cert. granted in part*, 552 U.S. 1074 (2007), *cert. dismissed*, 552 U.S. 1136 (2008).[3] In *Huber*, the Eighth Circuit reversed and remanded for entry of judgment in favor of the employer where the employee, a dry grocery order filler, sought reassignment to a vacant, equivalent position after sustaining a permanent injury that prevented her from performing the essential functions of her job, but was denied such reassignment because she was not the most qualified candidate and was later placed at another facility in a janitorial position earning a much lower rate of pay. *Id.* at 481, 484.

The Fourth Circuit Court of Appeals has not addressed this issue. At the time the Magistrate Judge issued the Report, the case of *United States v. Woody*, 220 F. Supp. 3d 682, 684 (E.D. Va. 2016), was pending appeal. In *Woody*, the District Court for the Eastern District of Virginia stated:

> Consistent with the Supreme Court's guidance in *Barnett*, the Court holds here that the ADA does not require minimally qualified disabled employees to be granted special preferences in hiring over non-disabled applicants. *See also Huber v. Wal–Mart Stores, Inc.*, 486 F.3d 480, 483 (8th Cir. 2007) (holding the same); *Daugherty v. City Of El Paso*, 56 F.3d 695 (5th Cir. 1995) (holding the same); *EEOC v. Sara Lee Corp.*, 237 F.3d 349 (4th Cir. 2001) (implying the same conclusion in dicta). Where an employer maintains a non-discriminatory policy of hiring the most qualified candidate, it would not ordinarily be reasonable (in the run of cases) to require deviation from that policy in order to accommodate a minimally but lesser qualified disabled applicant. This interpretation of the statute is the only one

---

[3] The U.S. Supreme Court granted certiorari in *Huber* but the parties settled and the case was dismissed. It is worth noting that the *Huber* court relied in part on reasoning from *EEOC v. Humiston-Keeling, Inc.*, 227 F.3d 1024, 1027-28 (7th Cir. 2000), a pre-*Barnett* case that the Seventh Circuit expressly overruled in *United Airlines. See United Airlines*, 693 F.3d at 761.

consistent with the plain text and clear purpose of the ADA, and it is "bolstered," not undercut, by the Supreme Court's analysis in *Barnett*.

220 F. Supp. 3d at 694 (E.D. Va. 2016). The *Woody* court cited extensively from the legislative history of the ADA, concluding that "it only confirms what the text already teaches: that the ADA does not require employers to give preferences in hiring to disabled persons, thereby discriminating against those without a disability." *Id.* at 691-92. In the interim between the Report and the issuance of this Order, the *Woody* appeal was voluntarily dismissed pursuant to the appellant's (United States) Federal Rule of Appellate Procedure 42(b) motion. *See U.S. v. Woody*, No. 17-1082 (4th Cir. 2017) (Doc. Nos. 16 & 17). No briefing was filed in the appeal.

The Magistrate Judge found the analyses set forth by the Eleventh Circuit in *St. Joseph's Hospital* and the District Court for the Eastern District of Virginia in *Woody* to be "more persuasive . . . than the cases relied upon by Plaintiff that require mandatory reassignment of a disabled employee into a vacant position" in violation of an employer's best-qualified hiring or transfer policy. (ECF No. 96 at 26, 28.) Importantly, however, the Court need not reach the issue of whether mandatory reassignment in contravention of an employer's facially neutral apply/compete policy is required post-*Barnett*. The principle of judicial restraint counsels against unnecessarily deciding a contentious legal issue in the absence of controlling case law, particularly where, as here, the issue is not squarely presented to the Court but only tangentially incorporated into the extant claims. No matter which side of the case law one embraces, the factual record shows that Plaintiff has failed to demonstrate the existence of any genuine dispute of material fact, and Defendant is entitled to judgment on the wrongful discharge claim as a matter of law.

First, it should be noted that in each of the above cases where the *Barnett* analysis was implicated, including *Barnett* itself, the employees actually *requested* reassignment as an accommodation; that is, they *sought* reassignment to a specific vacant position(s). Here, the undisputed evidence shows that Whitten effectively *rejected* reassignment alternatives that arose during the six months she was on a medical leave of absence because she was dissatisfied with the drastically reduced pay that would have come with those alternatives. By the time Whitten eventually communicated to McLeod that she was interested in the Monitor Technician position, she had already been discharged, and the ADA's rules for reassignment of "employees" no longer applied to her.[4]

In its supplemental brief, Plaintiff argues that the plain language of the ADA places "only two onuses . . . on an employee when reassignment is being considered as a reasonable accommodation: (1) the individual must be qualified for the position, and (2) the individual must express a desire for the position." (ECF No. 85 at 10 (citing 42 U.S.C. § 12111(8)).) In its objections, Plaintiff asserts that "the ADA placed the onus on Defendant to reassign Whitten to a vacant position for which Whitten was qualified and desired," and suggests that Defendant could have satisfied its putative duty to reassign by making a firm offer for Whitten to accept or reject. (ECF No. 97 at 12-13.) Even if the Court were to accept this analytical rubric, Plaintiff has failed to demonstrate that Whitten expressed sufficient interest in the Monitor Technician position or the receptionist

---

[4] Plaintiff points to a letter from Whitten's counsel to McLeod, dated prior to Whitten's discharge, as evidence that she timely expressed interest in the Monitor Technician position. But, as will be explained more fully *infra*, there is no evidence that the letter was transmitted to McLeod prior to Whitten's discharge, and there is ample evidence of record that the letter was received by McLeod on March 5, 2013, approximately three weeks after Whitten's February 13, 2013 termination.

position to create a reasonable belief on the part of McLeod that she "desired" either position. (*See* ECF No. 96 at 26-28.)

When McLeod placed Whitten on leave because she could not perform all essential functions of the Communication Specialist Position, McLeod assigned her a recruiter, Karen Kaercher ("Kaercher"), to assist her with finding an alternate job within the company. (Kaercher Dep. 16:21-17:1, ECF No. 84-10.) On several occasions, Whitten indicated to Kaercher that she was not interested in any jobs that would pay less than the hourly rate she was earning on short term disability, which was approximately $26.00 per hour. (*Id.* 20:7-21:23.) Each time Kaercher and Whitten discussed the possibility of an open position Whitten declined interest in the position after learning that it paid less than her current rate. (*Id.* 22:18-25:15, 29:11-20, ECF No. 93-1.) Whitten never submitted an application for any potential reassignment position in large part because the pay grades applicable to the positions she considered were much lower than her previous pay. (*Id.* 27:7-28:2, ECF No. 84-10; Kaercher Decl. ¶ 11, ECF No. 93-2; *see* Whitten Dep. 116:10-117:19, ECF No. 44-7; Carr Dep. 58:12-64:12, ECF No. 40-5.) On January 31, 2013, after having been informed that her leave was about to expire, Whitten called to inquire about the Monitor Technician position, which had recently become vacant. On February 1, 2013, Kaercher called Whitten back and, in response to Whitten's questions, explained that the position would pay $7.36 per hour because Whitten had no related experience or training. (Employee Placement Request, Ex. 3, Kaercher Dep., ECF No. 93-1 at 19-20.) Kaercher's contemporaneous notes from that phone call reflect the following: "I asked Celia if she wanted me to send her forward for

consideration or if she needed to think about the salary and call me back. She stated that she needed to call me back." (*Id.* at 20; *see* Kaercher Decl. ¶¶ 6-9, ECF no. 93-2.) Whitten never called Kaercher back after Kaercher explained the low pay associated with the Monitor Technician position, and never indicated continued interest in the position in any other fashion. (*Id.* ¶ 9.) On February 13, 2013, having exhausted the maximum allowable time for a medical leave of absence, a period of six consecutive months, and having no pending applications for an alternative position, Whitten was discharged. (*See* ECF No. 84-8.)

Thus, the undisputed evidence reveals that at the time of her termination the only information anyone at McLeod possessed regarding Whitten's interest in any vacant position(s) was that she did not want a position that paid less than the rate she had been making in the Communications Specialist position and/or on short-term disability. The Magistrate Judge was right to conclude as much. (*See* ECF No. 96 at 28.) Whitten even testified in her deposition that she "didn't see [the Monitor Technician position] as a possibility" because of the rate of pay. (Whitten Dep. 117:13-19, ECF No. 44-7.)

Plaintiff offers a letter dated February 4, 2013, sent from Whitten's attorney to Shannon Carr ("Carr"), Director of Employee Care in McLeod's Human Resources Department, as evidence that Whitten expressed interest in the Monitor Technician position prior to being discharged. The relevant portion of the letter reads: "Ms. Whitten has . . . reviewed open positions on the website and did not see any jobs available based on her experience. She is willing to attempt the Monitor Technician position with the appropriate training." (ECF No. 44-4 at 41.) As noted above, Whitten stated on February

1, 2013, that she would call Kaercher back to inform Kaercher if she was interested in the Monitor Technician position, but Whitten's attorney directed the February 4, 2013 letter to Carr, not Kaercher. There is also an unexplained one-month gap between the date of the letter and the date it was stamped received by McLeod's Human Resources Department, March 5, 2013. (*See id.*) The Magistrate Judge took up this issue with the parties in a telephonic hearing and documented the results of his inquiries in the Report:

> During a hearing via telephone conference on May 2, 2017, the undersigned noted this gap in time and invited the parties to provide any additional evidentiary support in their supplemental briefs for the date the letter was actually received. *Plaintiff did not address this issue.* Despite the fact that the letter indicated that it was mailed "Certified Mail Return Receipt Requested," Document stamped MCLEOD-E-000413 (Ex. C to Pl. Resp.), *Plaintiff failed to present a return receipt indicating when the letter was received by McLeod.* The additional evidence presented by Defendant indicated that Carr testified that she received the letter on March 5, 2013. Carr Dep. 65 (Ex. D to Def. 2nd Supp. Brief). Carr also provided a declaration in which she stated the same. Carr Decl. ¶ 3 (Ex. E to Def. 2nd Supp. Brief). She stated that "Human Resources stamps the date received on any official correspondence, such as a letter from a law firm. The stamp on the letter is March 5, 2013, indicating it was not received by Human Resources until March 5, 2013. Carr Decl. ¶ 4. Carr further provided that her "research and McLeod's records reflect the letter was scanned and forwarded to McLeod's legal counsel on March 5, 2013," which was consistent with her having received the letter and "immediately forwarding it to legal counsel, as is [her] practice with such correspondence from a law firm." Carr Decl. ¶ 5. "McLeod has no records, documents or other information suggesting it received the letter sooner than March 5, 2013.["] Carr Decl. ¶ 6.

(ECF No. 96 at 27 n.12 (emphasis added).) Even after this issue, which has become central to Plaintiff's case,[5] was so clearly delineated by the Magistrate Judge, Plaintiff failed to address it in its objections, made no attempt to explain the lack of evidence for pre-termination delivery of the letter, and made no attempt to counter Defendant's well-

---

[5] (*See* Pl.'s Objections, ECF No. 97 at 3 ("For purposes of the instant objections, the three most salient facts are as follows: . . . (2) the February 4, 2013 letter from Whitten's then-legal representative states in no uncertain terms, '[Whitten] is willing to attempt the Monitor Technician position.' . . . .").)

supported assertion that the letter was received on March 5, 2013. Accordingly, the *only* evidence for the date upon which Whitten's representative conveyed her interest in a vacant position is the evidence presented by McLeod, which reflects a date three weeks *after* Whitten's discharge, and approximately one week after the position had already been offered to another candidate whose background and reference checks cleared.[6] Thus, there is no genuine dispute regarding whether Whitten sufficiently expressed interest in the Monitor Technician position, or any other reassignment position, prior to her termination—she did not. By the time her attorney's letter reached Defendant, McLeod had no obligation to accommodate Whitten under the ADA.

If the foregoing analysis of Defendant's putative duty to reassign Whitten to a vacant position without her ever having requested a reassignment seems attenuated from the material issues in this case, it is because it *is* attenuated. But this attenuation is due to Plaintiff's attempt to shoehorn a failure to accommodate theory into the only remaining claim—discriminatory discharge. To put it succinctly, Plaintiff's first objection— that "[t]he Report errs in its legal analysis of and conclusion with regard to whether the [ADA's] reasonable accommodation provision requires an employer to affirmatively reassign a disabled employee to a vacant position when the employee satisfies the position's basic qualification standards and expresses a desire in the position"—is a complete red herring. Therefore, the Magistrate Judge was entirely correct in the Report when he wrote:

---

[6] In her declaration, Darlene Felker ("Felker"), the McLeod Healthcare Recruiter assigned to the Monitor Technician position, states: "As of February 21, 2013, a final candidate for the Monitor Tech Position had been selected by the hiring manager." (Felker Decl. ¶ 9, ECF No. 93-3.) "The background check process for [the selected candidate] cleared on February 23, 2013." (*Id.* ¶ 14.) "The reference checks for [the selected candidate] cleared on February 25, 2013, and the verbal offer was made to [her]." (*Id.* ¶ 15.)

> [E]ven if the [C]ourt followed Plaintiff's argument that only two onuses are placed on an employee when reassignment is being considered as a reasonable accommodation—that the individual must be qualified for the position and the individual must express a desire for the position—Whitten would fail to qualify as a qualified individual with a disability because she *failed to express a desire for any vacant position prior to her termination*.

(ECF No. 96 at 28 (emphasis added).) Plaintiff spends the majority of its argument attempting to show that the *St. Joseph's Hospital* and *Woody* opinions were wrongly conceived and legally unsound, and to advance an interpretation of *Barnett* that would compel an employer to reassign a displaced, disabled employee as a matter of course, regardless of the degree of dissimilarity between the prior position and the reassignment position, so long as the employee "satisfies the position's basic qualification standards and expresses a desire in the position." (*See* ECF No. 97 at 1, 4-11.) In doing so, Plaintiff resolutely ignores the uncontested fact that Whitten *rejected* the reassignment opportunities available to her. Accordingly, Plaintiff's first objection is overruled.

Plaintiff next objects that the Magistrate Judge erred in "applying a flawed reassignment analysis to the facts of this case, resulting in a determination that would not be reached under application of the correct reassignment standard." (ECF No. 97 at 11.) The EEOC asserts that McLeod's failure to automatically reassign Whitten is evidence in support of prongs one and four of its *prima facie* discriminatory discharge claim. (*Id.* at 12.) Specifically, Plaintiff argues that Defendant's "legal failing is evidence that . . . Defendant's proffered reason[] for discharging Whitten is mere pretext," and "standing alone, is sufficient evidence to raise a genuine issue of material fact as to whether Whitten's discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." (*Id.*)

This line of argument has no basis in fact. "To establish a prime facie case of wrongful discharge, a plaintiff must show by a preponderance of the evidence that (1) she is within the ADA's protected class; (2) she was discharged; (3) at the time of her discharge, she was performing the job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Haneke v. Mid-Atl. Capital Mgmt.*, 131 F. App'x 399, 400 (4th Cir. 2005) (citing *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001)). Nothing in the record implicates the slightest inference that McLeod's unsuccessful attempts to reassign Whitten reveal the specter of unlawful discrimination. To the contrary, the evidence shows that Kaercher considered Whitten to be eligible for the Monitor Technician position, the only vacant position in which Whitten expressed a passing interest, when one could only say she was "qualified" in the most technical sense.

The job posting for the Monitor Technician position read as follows:

Job Posting for job 20120615/Monitor Tech

The Monitor Technician supports the nursing process through the constant observation and documentation of the cardiac rhythm of patients assigned to telemetry monitoring. The Monitor Technician alerts the Nurse assigned to the patients to any changes in cardiac rate of rhythm. The Monitor Technician does not supervise other employees but works closely with physicians, nurses and nursing assistance personnel.

Work Schedule: Full time, 72 hours biweekly, rotating shifts.

Education/Experience Requirements: High School diploma or equivalent (GED) with evidence of Nursing Assistant Training preferred. Completion of cardiac care, monitoring, or EKG course preferred.

Certification requirements: Must attend EKG monitoring class and successfully pass written and didactic examination. At least 1 year but

typically less than 3 years of total related work experience preferred.

Unit Description: Telemetry - telemetry monitoring and observation for all hospital telemetry services.

(Kaercher Decl. ¶ 4, ECF No. 93-2; Felker Decl. ¶¶ 3-4, ECF No. 93-3.) The only education/experience requirement that Whitten satisfied was her possession of a high school diploma. She had no Nursing Assistance Training, and she had not completed any cardiac care, monitoring, or EKG courses. (Kaercher Decl. ¶ 10, ECF No. 93-2.) Neither did she have at least one year of work related experience. (*Id.*) In other words, Whitten possessed *none* of the "preferred" education, experience, and certification qualifications itemized in the posting.

The more detailed job specification for a Monitor Technician at McLeod reads:

**JOB SUMMARY OF RESPONSIBILITIES:**
The Monitor Technician works with nursing staff by watching telemetry monitors. He/She immediately notifies the nurse responsible for the patient, of any changes in rhythms and rates. He/She is responsible for running the strips for each shift, admission and discharge strips, and delivering them for charting. Collaborates with the nurse when patients are off the unit for procedures and places monitoring on standby. He/She is responsible for keeping the telemetry log up to date. Performs other duties as assigned or requested.

**REPORTING RELATIONSHIPS:**
Reports to Unit Director/House Supervisor/Charge Nurse/RN/LPN

**MINIMAL JOB QUALIFICATIONS:**
Desired successful completion of Monitor Tech Course or 1 year experience as a Monitor Tech

**EDUCATION REQUIREMENTS:**
High school graduate or equivalent (GED)

**EXPERIENCE REQUIREMENTS:**

Computer skills- Knowledge of computer programs utilized to deliver patient care and monitoring.

Completed a course in Basic EKG monitoring with lethal arrhythmia recognition or equivalent education of lethal arrhythmia recognition through monitor tech course
Scores 100% on lethal arrhythmia test
Knowledge and skill with operation of telemetry unit.
Ability to read and interpret documents such reports, safety rules, operating and maintenance instructions, and policy and procedure manuals. Ability to interact effectively with peers, physicians, other health care providers.
Ability to add, subtract, multiply, and divide.
Ability to apply common sense understanding to carry out instructions furnished in written, oral, or diagram form. Ability to think critically and prioritize actions to promote optimal patient outcomes.

**PHYSICAL REQUIREMENTS:**

1. Must be able to sit for long periods of time
2. Assist in the physical movement and cleaning of equipment.
3. Must be able to lift 25 lbs.
4. Must be able to view monitor screens for long periods of time and be able to hear/see monitor alarms.

**AGE SPECIFIC QUALIFICATIONS:**

Required to demonstrate the knowledge, skills and abilities to effectively communicate with and provide age appropriate monitoring for all age specific populations.

**OSHA TASK CATEGORY: 1**

(Attach. 1, Kaercher Decl., ECF No. 93-2 at 6-7 (verbatim); Attach. 1, Felker Decl., ECF No. 93-3 at 7-8.) Again, a simple comparison between the job specification and Whitten's education and experience reveals that the *only* requirement she satisfied was being a high school graduate. She had *no* work or training in the field, let alone one year. She had *no* experience with computer software used to deliver patient care and monitoring. Moreover, the specification lists the ability to assist in the physical movement and cleaning of equipment as a physical requirement of the position, in particular the ability to lift twenty-five pounds. (*Id.*) In contrast, Laliberte's report stated that Whitten's above-the-

waist lifting should be limited to twenty pounds and her above-the-shoulder lifting to fifteen pounds. (Ex. 4, Laliberte Dep., ECF No. 84-3 at 7.) Additionally, Felker has affirmed that she cannot recall McLeod ever hiring a candidate for the Monitor Technician position who had not already completed the "Monitor Tech Course" (also referred to as the "EKG course").[7] (Felker Decl. ¶ 6, ECF No. 93-3.)

Nevertheless, Kaercher considered Whitten eligible for the Monitor Technician position when they discussed it on February 1, 2013. Far from constituting evidence of "circumstances that raise a reasonable inference of unlawful discrimination," this indicates a willingness on McLeod's part to take a generous view toward Whitten's qualifications. In any event, it is pure speculation for Plaintiff to assert that the mere fact Whitten was not reassigned means that Defendant's proffered reason for terminating her was pretextual. There is no evidence of record to suggest that Whitten declined to pursue the Monitor Technician position for any reason other than her own objection to the rate of pay. For example, one might imagine a scenario in which Whitten declined to be considered for the position because she subjectively believed she would not be competitive in the application process. No such scenario existed here. Rather, Whitten rejected Defendant's efforts to place her in consideration for the Monitor Technician and receptionist positions because she did not want to be paid any less than she had been previously. By her own words and actions she indicated her hesitancy to seek either position because of pay, instructed Kaercher to await further communication, and never

---

[7] On these points, the Court would draw the parties' attention to a section of the EEOC's reassignment guidance that neither party has raised. Speaking specifically to the question of whether an employee is "qualified" for a potential reassignment position, the Guidance states: "There is no obligation for the employer to assist the individual to become qualified. Thus, the employer does not have to provide training so that the employee acquires necessary skills to take a job." Guidance, 2002 WL 31994335, at *20.

reached back out to express a desire to change her initial declination to be considered (until, of course, she had already been discharged). It would be an absurd interpretation of the statute and the EEOC guidance to require employers, especially large ones with vast numbers of employees and potentially numerous job vacancies on any given date, to reassign a displaced employee to a vacant position without regard to that employee specifically declining to be considered for the position. "'Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown. But where . . . the employer does not obstruct the process, but instead makes reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed, ADA liability simply does not follow.'" *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 28 (1st Cir. 2001) (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996)). Accordingly, Plaintiff's second objection is overruled.

In summary, this litigation has veered largely off track due to an inordinate focus on the circuit split surrounding an employer's duty to reassign a displaced, disabled employee in contravention of the employer's facially neutral hiring policy. The parties, in their turn, have each encouraged the Court to take their respective position on the question of whether the ADA is an affirmative action statute. But the Court need not answer that question to decide what is, at its core, a fairly straightforward issue— whether Plaintiff has demonstrated the presence of a genuine issue of material fact as to the discriminatory nature of Whitten's termination. It has not, and Defendant has shown that it is entitled to judgment as a matter of law.

The Court is not unsympathetic to Ms. Whitten's plight in this employment scenario. After having served as McLeod's Communications Specialist for nearly thirty years, it is entirely understandable that she would experience a sense of unfairness in losing that position and not finding a position with McLeod for which she was qualified and that came with comparable pay. But the Court cannot ignore the law and adjudicate cases based on its own, or Ms. Whitten's, notions of fairness. Nor can the Court redraft Plaintiff's complaint to add claims that are not squarely presented or ignore facts that weigh against a sympathetic party. Ultimately, Plaintiff failed to demonstrate the presence of a triable issue on the discriminatory discharge claim. Thus, the Court is compelled to grant summary judgment in Defendant's favor.

## CONCLUSION

After careful consideration of the record, the relevant briefing and objections, and the Report, the Court adopts the recommendation of the Magistrate Judge and hereby incorporates the Report by specific reference to the degree not inconsistent with this Order. It is, therefore, ORDERED that Defendant's Motion for Summary Judgment (ECF No. 40) is GRANTED in its entirety. The EEOC's claim that Defendant wrongly terminated Ms. Whitten in violation of the ADA is dismissed and the case is dismissed *with prejudice*.

**IT IS SO ORDERED.**

/s/Bruce Howe Hendricks
United States District Judge

Greenville, South Carolina
September 21, 2017